IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WHEATON COLLEGE, | |
| *Plaintiff*, | |
| v. | |
| KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMANSERVICES; THOMAS PEREZ, Secretary of the United States Department of Labor; UNITED STATES DEPARTMENT OF LABOR; JACOB LEW, Secretary of the United States Department of the Treasury; and UNITED STATES DEPARTMENT OF THE TREASURY, | Civ. Action No. _____  Jury Demanded |
| *Defendants*. | |

# COMPLAINT

Comes now Plaintiff, Wheaton College, by and through its attorneys, and states as follows:

## NATURE OF THE ACTION

1.      This is a challenge to regulations issued under the 2010 "Affordable Care Act" that force employee and student health insurance plans to provide free coverage of contraceptives, sterilizations, and drugs and devices that cause early abortions (the "Final Mandate").

2.      Plaintiff, Wheaton College ("Wheaton"), is a Christian liberal arts college located in Wheaton, Illinois. Wheaton's religious beliefs forbid it from participating in, providing access to, paying for, designating others to pay for, training others to engage in, or otherwise supporting abortion. Wheaton is among the many American religious organizations that hold these beliefs.

3.      In light of these religious beliefs, Wheaton cannot participate in the government's regulatory scheme to promote, encourage, and subsidize the use of drugs and devices that cause abortions.  Under the Final Mandate, however, Wheaton faces millions of dollars in fines for this religious exercise.

4.      Defendants have exempted thousands of plans, covering tens of millions of employees, from the Final Mandate.  These exemptions have been granted for a wide variety of reasons, from the purely secular exemption for plans in existence before a certain date ("grandfathered plans") to a narrow religious exemption for certain "religious employers."

5.      Despite its obvious religious nature, Wheaton does not qualify for any exemptions.  While "religious employers" are exempted, Defendants have limited that exemption to protect only "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." That is because, in the eyes of the government, Wheaton's work educating students "For Christ and His Kingdom" is not an "exclusively religious activity."

6.      The regulations do offer Wheaton and other non-exempt religious organizations what Defendants have labeled an "accommodation." But the "accommodation" still requires Wheaton to play a central role in the government's scheme, because it must designate an agent to pay for the objectionable services on Wheaton's behalf, and it has to take steps to trigger and

facilitate that coverage. Wheaton cannot take these actions to facilitate this coverage without violating its religious beliefs.

7. The supposed "accommodation" also continues to treat Wheaton as a second-class religious organization, not entitled to the same religious freedom rights as other religious organizations, including any religious schools that are "integrated auxiliaries" of churches.

8. The "accommodation" also creates administrative hurdles and other difficulties for Wheaton, forcing it to seek out and contract with companies willing to provide the very drugs and services it speaks out against.

9. If Wheaton does not compromise its religious convictions and comply with the regulations, however, it faces severe penalties that could exceed $25.7 million each year.

10. By placing Wheaton in this impossible position, Defendants have violated the Religious Freedom Restoration Act, as well as the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment of the United States Constitution, The Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act.

11. Wheaton therefore respectfully requests declaratory and permanent injunctive relief.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

13.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this district, and Plaintiff resides in this district.

## IDENTIFICATION OF PARTIES

14.     Plaintiff Wheaton College is a liberal arts college in Wheaton, Illinois. Founded in 1860 by abolitionist Jonathan Blanchard, Wheaton's mission is to "serve[] Jesus Christ and advance[] his kingdom through excellence in liberal arts and graduate programs that educate the whole person to build the church and benefit society worldwide."  Wheaton's motto is "For Christ and His Kingdom."

15.     Defendants are appointed officials of the United States government and the United States governmental agencies responsible for issuing the Mandate.

16.     Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Sebelius is sued in her official capacity only.

17.     Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

18.     Defendant Thomas Perez is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor. Perez is sued in his official capacity only.

19.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

20. Defendant Jacob Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department of the Treasury. Lew is sued in his official capacity only.

21. Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

## FACTUAL ALLEGATIONS

I. **Wheaton's Religious Beliefs and Practices Related to Insurance for Abortion**

22. Wheaton is a liberal arts college located in Wheaton, Illinois. It was founded in 1860 by abolitionist Jonathan Blanchard.

23. Today, Wheaton "is an institution of higher learning, a rigorous academic community that takes seriously the life of the mind." See http://www.wheaton.edu/About-Wheaton/Community-Covenant. Wheaton offers 59 undergraduate degree programs and 22 graduate degree programs, including five doctoral programs.

24. Faith is central to the education mission of Wheaton. Wheaton aspires "to live, work, serve, and worship together as an educational community centered around the Lord Jesus Christ." Wheaton College, Community Covenant, http://www.wheaton.edu/about-wheaton/community-covenant.

25. Wheaton's purpose is expressed in its mission statement: "Wheaton College serves Jesus Christ and advances his kingdom through excellence in liberal arts and graduate programs that educate the whole person to build the church and benefit society worldwide."

26. Wheaton's motto is "For Christ and His Kingdom."

27. In order to further its mission, Wheaton has a longstanding conviction that appropriate "institutional standards" help to "foster the kind of campus atmosphere most

conductive to becoming the Christian community of living, learning, and serving that Wheaton College aspires to be."

28. Each year, all Wheaton students and full-time employees voluntarily commit themselves to this community by signing Wheaton's Community Covenant.

29. In addition to signing the Community Covenant, Wheaton's Board of Trustees, faculty, and staff annually reaffirm Wheaton's doctrinal statement, which provides a summary of biblical doctrine that is consonant with Evangelical Christianity. See http://www.wheaton.edu/About-Wheaton/Statement-of-Faith-and-Educational-Purpose.

30. Wheaton's Community Covenant recognizes that Scripture condemns the taking of innocent life. (Wheaton College, Community Covenant, http://www.wheaton.edu/about-wheaton/community-covenant.)

31. Wheaton holds religious beliefs that include traditional Christian teachings on the sanctity of life. Wheaton believes and teaches that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious, from the moment of conception. Wheaton therefore believes and teaches that abortion ends a human life and is a sin.

32. Wheaton is registered as a tax-exempt organization under 26 U.S.C. § 501(c)(3).

33. Wheaton is not a church, an integrated auxiliary of a church, or a convention or association of churches as defined by 26 U.S.C. § 6033(a)(3)(A)(i).

34. Wheaton is not a religious order as defined by 26 U.S.C. § 6033(a)(3)(A)(iii).

35. Wheaton is not a church or a convention or association of churches as defined by 26 U.S.C. § 414(e).

36. Wheaton has about 2,400 undergraduate and 600 graduate students.

37.     Wheaton has about 709 full-time and 161 part-time employees as of December 2, 2013.

38.     As part of its religious convictions, Wheaton promotes the well-being and health of its students and employees. This includes provision of generous health services and health insurance for its students and employees.

39.     Wheaton's religious beliefs prohibit it from deliberately providing insurance coverage for drugs, procedures, or services inconsistent with its faith, in particular abortion-inducing drugs, abortion procedures, and related services.

40.     It is similarly a violation of Wheaton's religious beliefs to deliberately provide health insurance that would facilitate access to abortion-causing drugs, abortion procedures, and related services, even if those items were paid for by an insurer or a plan administrator and not by Wheaton.

41.     Wheaton has no religious objection to providing coverage for contraceptive drugs and devices that prevent conception (as opposed to interfering with the continued survival of a human embryo).

42.     Wheaton's employees and students choose to work at or attend Wheaton because they share its religious beliefs and wish to help Wheaton further its mission. Wheaton would violate their implicit trust in the organization and detrimentally alter its relationship with them if it were to violate its religious beliefs regarding abortion.

43.     Wheaton has expended significant resources working with its insurers and plan administrators to ensure that its health insurance policies reflect Wheaton's religious beliefs.

44.     On September 27, 2011, Wheaton submitted public comments on the Interim

Final Rule on Preventative Services published on August 3, 2011 (76 Fed. Reg. 46621).[1]

Wheaton's comments expressed its concern that the interim final rule failed to recognize it as a

religious employer and that the rule violates Wheaton's rights of conscience.

45.     On June 19, 2012, Wheaton submitted public comments on the Advance Notice of

Proposed Rulemaking on Preventative Services published on March 21, 2012 (77 Fed. Reg.

16501). Wheaton's comments reiterated its concerns about the interim final rule, particularly

Defendants' refusal to provide it and similar religious employers with the same exemption

afforded to churches.

46.     The plan year for Wheaton's employee insurance plans began on July 1, 2013 and

a new plan year will begin on July 1, 2014.

47.     Wheaton made certain changes to its employee insurance plans effective April 1,

2012, that render Wheaton healthcare plans ineligible for grandfathered status. *See* 45 C.F.R. §

147.140(a)(1)(i), 26 C.F.R. § 54.9815-1251T(a)(1)(i); 29 C.F.R. § 2590.715-1251(a)(1)(i). In

particular, Wheaton removed coverage for prescription drugs from two of its employee insurance

plans and created new drug benefit plans for employees. None of these plans are grandfathered.

## II.     The Affordable Care Act and Preventive Care Mandate

48.     In March 2010, Congress passed, and President Obama signed into law, the

Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health

Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known

as the "Affordable Care Act."

---

[1]  Letter from President Philip G. Ryken, President, Wheaton College, to IRS Commissioner Douglas H. Shulman (Sept. 27, 2011), available at http://www.regulations.gov/#!documentDetail;D=IRS-2010-0017-0975.

49.     The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

50.     One provision of the Act mandates that any "group health plan" or "health insurance issuer offering group or individual health insurance coverage" must provide coverage for certain preventive care services. 42 U.S.C. § 300gg-13(a).

51.     The services required to be covered include medications, screenings, and counseling given an "A" or "B" rating by the United States Preventive Services Task Force;[2] immunizations recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and "preventive care and screenings" specific to infants, children, adolescents, and women, as to be "provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(1)-(4).

52.     The statute specifies that all of these services must be provided without "any cost sharing." 42 U.S.C. § 300gg-13(a).

---

[2] The list of services that currently have an "A" or "B" rating include medications like aspirin for preventing cardiovascular disease, vitamin D, and folic acid; screenings for a wide range of conditions such as depression, certain cancers and sexually-transmitted diseases, intimate partner violence, obesity, and osteoporosis; and various counseling services, including for breastfeeding, sexually-transmitted diseases, smoking, obesity, healthy dieting, cancer, and so forth. *See* U.S. Preventive Services Task Force, USPSTF A and B Recommendations, http://www.uspreventiveservicestaskforce.org/uspstf/uspsabrecs.htm (last visited Dec. 2, 2013) (Ex. A); *see also* 75 Fed. Reg. 41726, 41740 (2010).

The Interim Final Rule

53.     On July 19, 2010, HHS[3] published an interim final rule promulgating directives concerning the Affordable Care Act's requirement for coverage of preventive services without cost sharing. 75 Fed. Reg. 41726, 41728 (2010).

54.     The interim final rule was enacted without prior notice of rulemaking or opportunity for public comment, because Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed." 75 Fed. Reg. at 41730.

55.     Although Defendants suggested in the Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id.*

56.     Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments. *Id.*

57.     In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

58.     The Interim Final Rule made clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries. 75 Fed. Reg. at 41730.

---

[3] For ease of reading, references to "HHS" in this Complaint refer to all Defendants, unless context indicates otherwise.

59. The Interim Final Rule acknowledged that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees." *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums.").

60. In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population." 75 Fed. Reg. at 41730.

61. After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

62. HHS directed a private health policy organization, the Institute of Medicine (IOM), to make recommendations regarding which drugs, procedures, and services should be considered in comprehensive guidelines for preventive care for women.

63. IOM was not tasked with making insurance coverage recommendations and explicitly excluded cost considerations and other considerations relevant to coverage recommendations from its determinations regarding effective preventive care for women.

64. In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

65.     No religious groups or other groups that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

66.     On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include all "Food and Drug Administration approved contraceptive methods [and] sterilization procedures." Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at 102-10 and Recommendation 5.5 (2011).

67.     FDA-approved contraceptive methods include birth-control pills; prescription contraceptive devices such as IUDs; Plan B (also known as the "morning-after pill"); uliprisal (also known as "ella" or the "week-after pill"); and other drugs, devices, and procedures.

68.     Some of these drugs and devices—including the "emergency contraceptives" Plan B, ella, and certain IUDs—are known abortifacients, in that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

69.     Indeed, the FDA's own Birth Control guide states that both Plan B and ella can work by "preventing attachment (implantation) to the womb (uterus)."[4]

70.     Although it mentioned emergency contraceptives in passing, the IOM Report included no separate analysis of known abortifacients like Plan B and ella. *See generally* Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, at 102-10 and Recommendation 5.5 (2011).

71.     The conditions under which the IOM Report was prepared prompted one member of the drafting committee to file a dissent, in which he stated that "the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the

---

[4] FDA, Birth Control: Medicines to Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm  (last visited Dec. 2, 2013) (Ex. B).

committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." *Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps,* at 232-233 (2011). The dissent deemed the evidence evaluation process a "fatal flaw" and concluded that "the committee erred [in] their zeal to recommend something despite the time constraints and a far from perfect methodology" and "failed to demonstrate [transparency and strict objectivity] in the Report." *Id.*

72.     On August 1, 2011, thirteen days after IOM issued its recommendations, HHS's Health Resources and Services Administration ("HRSA") issued guidelines adopting them in full.[5]

The "Religious Employers" Exemption

73.     That same day, HHS promulgated an additional Interim Final Rule. 76 Fed. Reg. 46621 (published Aug. 3, 2011).

74.     This Second Interim Final Rule granted HRSA "*discretion* to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623 (emphasis added). The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

---

[5] HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/ womensguidelines (last visited Dec. 2, 2013) (Ex. C).

75. The fourth of these requirements refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

76. Thus, the "religious employers" exemption was severely limited to formal churches, their integrated auxiliaries, and religious orders whose purpose is to inculcate faith and that hire and serve primarily people of their own faith tradition.

77. HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines. The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers."[6]

78. Although religious organizations like Wheaton share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders, HHS deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46623.

79. Thus, thousands of religious organizations that cannot comply with the mandate for religious reasons were excluded from the "religious employers" exemption.

80. Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

---

[6] HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/ womensguidelines (Ex. C).

81. Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

82. Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employers" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

83. HHS did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.

84. Instead the Second Interim Rule was unresponsive to the concerns, including claims of statutory and constitutional conscience rights, stated in the comments submitted by religious organizations.

The Safe Harbor

85. The public outcry for a broader religious employer exemption continued for many months and, on January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law."[7]

86. On February 10, 2012, HHS formally announced a "safe harbor" for non-exempt nonprofit religious organizations that objected to the Mandate. *See* HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (Feb. 10, 2012); *see also* HHS Center for Consumer Information and

---

[7] Press Release, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), http://www.hhs.gov/news/press /2012pres/01/20120120a.html (Ex. D).

Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (Aug. 15, 2012) (changing the safe harbor eligibility criteria).

87. Under the safe harbor, HHS agreed it would not take any enforcement action against an eligible organization during the safe harbor, which would remain in effect until the first plan year beginning on or after August 1, 2013. HHS later extended the safe harbor to the first plan year beginning on or after January 1, 2014. HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (June 28, 2013).

88. HHS also indicated it would develop and propose changes to the regulations to accommodate the objections of non-exempt, nonprofit religious organizations following August 1, 2013.

89. Despite the safe harbor and HHS's accompanying promises, on February 15, 2012, HHS published a final rule "finaliz[ing], without change," the contraception and abortifacient mandate and narrow religious employers exemption. 77 Fed. Reg. 8725-01 (published Feb. 15, 2012).

The Advance Notice of Proposed Rulemaking

90. On March 21, 2012, HHS issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. 77 Fed. Reg. 16501, 16503 (2012).

91. The ANPRM conceded that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id.* (emphasis added).

92.     In vague terms, the ANPRM proposed that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id*.

93.     For self-insured plans, the ANPRM suggested that third party plan administrators "assume this responsibility." *Id*.

94.     For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id*.

95.     "[A]pproximately 200,000 comments" were submitted in response to the ANPRM. 78 Fed. Reg. 8456, 8459 (published February 6, 2013). Many of these comments reiterated previous comments that the ANPRM's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to religiously-objectionable drugs and services.

The Notice of Proposed Rulemaking

96.     On February 1, 2013, HHS issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456.

97.     The NPRM proposed two changes to the then-existing regulations. 78 Fed. Reg. 8456, 8458-59.

98.     First, it proposed revising the religious employers exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461

99.     Under this proposal a "religious employer" would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or [](iii) of the Internal Revenue Code." 78 Fed. Reg. at 8474.

100.     HHS emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. at 8461.

101.     In other words, religious organizations like Wheaton that are not formal churches would continue to be excluded from the exemption.

102.     Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

103.     The proposed "accommodation" did not resolve the concerns of religious organizations like Wheaton because it continued to force them to deliberately provide health insurance and take actions that would trigger access to religiously-objectionable drugs and related education and counseling.

104.     In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. at 8457.

105.     "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871 (published July 2, 2013), with religious organizations again overwhelmingly decrying the proposed accommodation as a gross violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

106.     Wheaton submitted comments on the NPRM, stating essentially the same objections stated in this complaint.[8]

107.     On April 8, 2013, the same day the notice-and-comment period ended, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

108.     In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.[9]

109.     It is clear from the timing of these remarks that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation." It is also clear that the Secretary recognizes that even under the accommodation, "religious entities" like Wheaton "will be providing coverage" for the drugs required by the Mandate.

The Final Mandate

110.     On June 28, 2013, Defendants issued a final rule (the "Final Mandate"), which ignores the objections repeatedly raised by religious organizations and continues to co-opt objecting religious employers into the government's scheme of expanding free access to contraceptive and abortifacient services. 78 Fed. Reg. 39870.

---

[8] Letter from President Philip G. Ryken, President, Wheaton College, to HHS Secretary Kathleen Sebelius (April 8, 2013) (Ex. E).

[9] The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (last visited Dec. 2, 2013) (from 51:20 to 53:56) (emphases added) . A permanent link to the relevant section of Sec. Sebelius' remarks is available here: http://www.youtube.com/watch?v=py6aSwQl-2g&feature=youtu.be (last visited Dec. 2, 2013).

111.    Under the Final Mandate, the discretionary "religious employers" exemption, which is still implemented via footnote on the HRSA website, Ex. C, remains limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

112.    All other religious organizations, including Wheaton, are excluded from the exemption.

113.    The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874.

114.    An organization is eligible for the accommodation if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

115.    The self-certification must be executed "prior to the beginning of the first plan year to which an accommodation is to apply." 78 Fed. Reg. at 39875.

116.    The Final Rule extends the current safe harbor through the end of 2013. 78 Fed. Reg. at 39889; *see also* HHS Center for Consumer Information and Insurance Oversight, Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (June 28, 2013) (extending the safe harbor to the first plan year that begins on or after January 1, 2014).

117.    Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator. 78 Fed. Reg. at 39875.

118.    By the terms of the accommodation, Wheaton will be required to execute the self-certification and deliver it to its insurers and plan administrators before July 1, 2014.

119.    By delivering its self-certification to its insurers and third-party administrators, Wheaton would trigger their obligations to "provide[] payments for contraceptive services," including abortion-causing contraceptives like Plan B and Ella. 78 Fed. Reg. at 39876 (insurers) *see also id.* at 39879 (third party administrators).

120.    In the case of its self-insured plan, Wheaton's self-certification acts as "a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." 78 Fed. Reg. at 39879.

121.    The administrator or insurer would be required to "provide payments for contraceptive services for plan participants and beneficiaries." 78 Fed. Reg. at 39876 (insurers); *see also id.* at 39879 (third-party administrators).

122.    In order for this obligation to be effective, Wheaton would have to identify its employees to the insurer or third-party administrator for the distinct purpose of enabling the government's scheme to facilitate free access to contraceptive and abortifacient services.

123.    The insurer's obligation to make direct payments for contraceptive and abortion services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. at 39876.

124.    Thus Wheaton would have to coordinate with its insurer or third-party administrator regarding when it was adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the abortifacient services payment scheme.

125.    Insurers and third-party administrators would be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to

the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in coverage . . . ." 78 Fed. Reg. at 39880 (third-party administrators); *see also id.* at 39876 (insurers).

126.    This would also require Wheaton to coordinate the notices with its insurers and administrators.

127.    Thus, even under the accommodation, Wheaton and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to abortifacient drugs.

128.    The insurer would be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.

129.    Thus, any payment or coverage disputes presumably would be resolved under the terms of Wheaton's existing plan documents.

130.    Under the accommodation, group health insurance issuers "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), *or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly*, on the eligible organization." 78 Fed. Reg. at 39896 (emphasis added).

131.    For all other preventive services, including non-contraceptive preventive services for women, only cost-sharing (*i.e.*, out-of-pocket expense) is prohibited. There is no restriction on passing along costs via premiums or other charges.

132.    Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive

coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.

133.    On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

134.    Nevertheless, even if the payments were—over time—to become cost neutral, it is undisputed that there will be up-front costs for making the payments. *See, e.g.,* 78 Fed. Reg. at 39877-78, 39880 (addressing ways insurers and administrators can cover up-front costs).

135.    Moreover, if cost savings arise that make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

136.    HHS suggests that, to maintain cost neutrality, issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." 78 Fed. Reg. at 39877.

137.    This encourages issuers to artificially inflate the eligible organization's premiums.

138.    Under this methodology—even assuming its legality—the eligible organization would still bear the cost of the required payments for contraceptive, sterilization, and abortifacient services in violation of its conscience, as if the accommodation had never been made.

139.    Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations." 78 Fed. Reg. at 39878.

140.    There is no legal authority for forcing third parties to pay for services provided to eligible organizations under the accommodation.

141.    Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers to directly purchase contraceptive, sterilization, and abortifacient services for an eligible organization's plan participants and beneficiaries.

142.    Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

143.    Currently, Wheaton operates a self-insured prescription drug plan administered by Blue Cross Blue Shield of Illinois. Because under the Affordable Care Act Wheaton would be required to identify and designate an administrator willing to administer the abortifacient services, Wheaton's religious beliefs preclude it from complying with the accommodation.

144.    For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations—such as Wheaton—from being co-opted as the central cog in the government's scheme to expand access to free abortifacient services.

145.    The Final Rule sets forth complex means through which a third party administrator may seek to recover its costs incurred in making payments for contraceptive and abortifacient services.

146.    The third party administrator must identify an issuer who participates in the federal exchanges established under the Affordable Care Act and who would be willing to make payments on behalf of the third party administrator.

147.    Cooperating issuers would then be authorized to obtain refunds from the user fees they have paid to participate in the federal exchange as a means of being reimbursed for making payments for contraceptive and abortifacient services on behalf of the third party administrator.

148.    Issuers would be required to pay a portion of the refund back to the third party administrator to compensate it for any administrative expenses it has incurred.

149.    These machinations, ostensibly employed only to shift the *cost* of the Final Mandate, are severely flawed.

150.    There is no way to ensure that the cost of administering the contraceptive and abortifacient services would not be passed on to religious organizations through the third party administrator's fees.

151.    Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees. *See* 78 Fed. Reg. 15410, 15412 (published March 11, 2013); 31 U.S.C. § 9701.

152.    In sum, for non-exempt religious organizations like Wheaton, the accommodation is nothing more than a shell game that attempts to disguise the religious organization's role as the central cog in the government's scheme for expanding access to abortifacient services.

153.    Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance and its self-certification continue to serve as the sole triggers for creating access to free abortifacient services.

154.    Wheaton cannot participate in or facilitate the government's scheme in this manner without violating its religious convictions.

Wheaton's Health Care Plan and Its Religious Objections

155.    The plan year for Wheaton's student healthcare plan begins on July 1 of each year.

156.     Wheaton's student health care plan consists of an insured plan issued by Companion Life Insurance Company.

157.     The Final Mandate declares that the rules concerning contraceptive, sterilization, and abortifacient services will "apply to student health insurance coverage arranged by an eligible organization that is an institution of higher education in a manner comparable to that in which they apply to group health insurance coverage provided in connection with a group health plan established or maintained by an eligible organization that is an employer." 78 Fed. Reg. at 39897.

158.     Thus, beginning on or about July 1, 2014, Wheaton faces the choice of either including free coverage for abortifacient services in its student health plan or else forcing its insurance issuer to provide the exact same services.

159.     The next plan year for Wheaton's employee healthcare plan begins on July 1, 2014. Wheaton provides three health insurance plans to its full-time employees. Those plans include two HMO plans offered through BlueCross/BlueShield of Illinois and one PPO plan, which is self-funded and administered by BlueCross/BlueShield of Illinois. As a supplement to the HMO plans, Wheaton now offers two self-funded prescription drug plans.

160.     Wheaton's self-insured PPO insurance plan has not changed significantly since March 23, 2010, and meets the definition of a "grandfathered" plan. *See* 45 C.F.R. § 147.140(a)(1)(i); 26 C.F.R. § 54.9815-1251T(a)(1)(i); 29 C.F.R. § 2590.715-1251(a)(1)(i).

161.     However, Wheaton's insured HMO plans and its self-funded prescription drug plans have changed significantly since March 23, 2010, and due to the changes they have not included the statements regarding grandfathered status required under federal law.  Thus, Wheaton's insured HMO healthcare plans do not meet the definition of a "grandfathered" plan.

*See* 45 C.F.R. § 147.140(a)(1)(i); 26 C.F.R. § 54.9815-1251T(a)(1)(i); 29 C.F.R. § 2590.715-1251(a)(1)(i).

162. Thus, beginning on or about July 1, 2014, Wheaton faces the choice of either including free coverage for abortifacient services in its insured HMO employee health plans and its self-funded prescription drug plans or else designating its administrator to provide the exact same services.

163. Wheaton has no objection to including, and already does include, free coverage for women's preventive services such as mammograms. It also has no conscientious objection to providing access contraceptives that do not inhibit implantation of an embryo, and currently covers those drugs.

164. However, Wheaton's religious convictions forbid it from including free coverage for abortifacient drugs in any of its healthcare plans.

165. Wheaton's religious convictions equally forbid it from hiring or designating its insurer to provide free access to abortifacient drugs.

166. From Wheaton's perspective, there is little difference between forcing its insurance issuer to provide free access to abortifacient drugs and directly providing that access.

167. Wheaton's religious convictions forbid it from participating in any way in the government's scheme to promote and provide free access to abortifacient drugs through Wheaton's health care plans.

168. Wheaton is not eligible for the religious employers exemption because it is not an organization "described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

169.     Because Wheaton is unable to comply with the Final Mandate as a result of its religious beliefs, and because it is unable to force its insurer to carry out the Final Mandate by submitting a self-certification, it faces crippling fines of $100 each day, for "each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

170.     Dropping its insurance plans would unfairly and severely burden Wheaton's employees and students, and would place Wheaton at a severe competitive disadvantage in its efforts to recruit and retain employees and students.

171.     Wheaton would also face fines of $2000 per year for each of its employees for dropping its insurance plans.

172.     Although the government has recently announced that it will postpone implementing the annual fine of $2000 per employee for organizations that drop their insurance altogether, the postponement is only for one year, until 2015. This postponement does not delay the crippling daily fines under 26 U.S.C. § 4980D.

173.     Wheaton's Christian faith compels it to promote the spiritual and physical well-being of its students and employees by providing them with generous health services.

174.     The Final Mandate forces Wheaton to violate its religious beliefs or incur substantial fines for either excluding objectionable coverage without forcing its insurance issuer to provide the same coverage, or terminating its employee and student health insurance coverage altogether.

175.     The Final Mandate forces Wheaton to deliberately provide health insurance that would facilitate free access to abortifacient drugs regardless of the ability of insured persons to obtain these drugs and services from other sources.

176.     The Final Mandate forces Wheaton to facilitate government-dictated education and counseling concerning abortion-causing drugs that are incompatible with its religious beliefs and teachings.

177.     Facilitating this government-dictated speech is incompatible and irreconcilable with the express speech and messages concerning the sanctity of life that Wheaton seeks to convey.

The Lack of a Compelling Government Interest

178.     The government lacks any compelling interest in coercing Wheaton to facilitate access to abortifacient drugs.

179.     The required abortifacient drugs are already widely available at non-prohibitive costs.

180.     There are multiple ways in which the government could provide access without co-opting religious employers and their insurance plans in violation of their religious beliefs.

181.     For example, the government could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct government payments, or through tax deductions, refunds, or credits.

182.     The government could also simply exempt all religious organizations, just as it has already exempted nonprofit religious employers referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

183.     HHS claims that its "religious employers" exemption does not undermine its compelling interest in making abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or

adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39887.

184.    Wheaton's employees and students commit to further its mission of serving "Christ and his kingdom," and its students and faculty members voluntarily sign its community covenant, which affirms their shared commitment to "uphold the God-given worth of human beings, from conception to death, as the unique image-bearers of God (Gen. 1:27; Psalm 8:3-8; 139:13-16)."

185.    Because of Wheaton's religious obligation under its Community Covenant to proclaim Christian teaching regarding the sanctity of life, the students and employees that have chosen to join the Wheaton community are just as likely as employees of exempt organizations to adhere to the same values, and thus are less likely than other people to use the objectionable drugs.

186.    In one form or another, the government also provides exemptions for (1) grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41726, 41731 (2010); (2) small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A); and (3) certain religious denominations, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

187.    These broad exemptions further demonstrate that the government has no compelling interest in refusing to include religious organizations like Wheaton within its religious employers exemption.

188.     Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

189.     Indeed, HHS has predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise. 75 Fed. Reg. 34538 (published June 17, 2010).[10]

190.     According to the administration, 96% of American employers are exempt from the employer mandate because they employ fewer than 50 people.[11]

191.     The government's recent decision to postpone the mandatory insurance requirement of the Affordable Care Act—i.e., the annual fine of $2000 per employee for not offering any insurance—also demonstrates that there is no compelling interest in coercing universal compliance with the Final Mandate concerning contraceptive and abortifacient services, since employers can now simply drop their insurance without any penalty, at least for one additional year.

192.     These broad exemptions also demonstrate that the Final Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

193.     The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest

---

[10] *See also* Centers for Medicare & Medicaid Services, Amendment to Regulation on "Grandfathered" Health Plans under the Affordable Care Act, https://www.cms.gov/CCIIO/ Resources/Files/factsheet_grandfather_amendment.html (noting that amendment to regulations "will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation") (last visited Dec. 2, 2013) (Ex. F).

[11] WhiteHouse.Gov, The Affordable Care Act Increases Choice and Saving Money for Small Business at 2, http://www.whitehouse.gov/files/documents/ health_reform_for_small_businesses.pdf (Ex. G).

of exemptions for religious organizations also shows that the Final Mandate is not neutral, but rather discriminates against religious organizations because of their religious commitment to promoting the sanctity of life.

194.    Indeed, the Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose Wheaton's religious teachings and beliefs regarding marriage and family.

195.    Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

196.    On October 5, 2011, six days after the comment period for the original interim final rule ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."[12]

197.    On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to people who opposed civil rights legislation in the 1960s, stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation."[13]

198.    Consequently, on information and belief, Wheaton alleges that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose abortion.

---

[12] William McGurn, *The Church of Kathleen Sebelius*, Wall St. J., Dec. 13, 2011, *available at* http://online.wsj.com/news/articles/ SB10001424052970203518404577094631979925326 (Ex. H).

[13] *See* Kathleen Sebelius, Remarks at the 104th NAACP Annual Conference, July 16, 2013, http://www.hhs.gov/secretary/about/speeches/sp20130716.html (Ex. I).

## CLAIMS

### <u>COUNT I</u>

**Violation of the Religious Freedom Restoration Act
Substantial Burden**

199.     Wheaton incorporates by reference all preceding paragraphs.

200.     Wheaton's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to abortifacients, or to related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

201.     The Final Mandate creates government-imposed coercive pressure on Wheaton to change or violate its religious beliefs.

202.     The Final Mandate chills Wheaton's religious exercise.

203.     The Final Mandate exposes Wheaton to substantial fines for its religious exercise.

204.     The Final Mandate exposes Wheaton to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

205.     The Final Mandate imposes a substantial burden on Wheaton's religious exercise.

206.     The Final Mandate furthers no compelling governmental interest.

207.     The Final Mandate is not narrowly tailored to any compelling governmental interest.

208.     The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

209.     The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate Wheaton's rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

210.     Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT II
**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Burden**

211.     Wheaton incorporates by reference all preceding paragraphs.

212.     Wheaton's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to abortifacients, or to related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

213.     Neither the Affordable Care Act nor the Final Mandate is neutral.

214.     Neither the Affordable Care Act nor the Final Mandate is generally applicable.

215.     Defendants have created categorical exemptions and individualized exemptions to the Final Mandate.

216.     The Final Mandate furthers no compelling governmental interest.

217.     The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

218.     The Final Mandate creates government-imposed coercive pressure on Wheaton to change or violate its religious beliefs.

219.     The Final Mandate chills Wheaton's religious exercise.

220.     The Final Mandate exposes Wheaton to substantial fines for its religious exercise.

221.     The Final Mandate exposes Wheaton to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

222.     The Final Mandate imposes a burden on Wheaton's religious exercise.

223. The Final Mandate is not narrowly tailored to any compelling governmental interest.

224. The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate Wheaton's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

225. Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

**COUNT III**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

226. Wheaton incorporates by reference all preceding paragraphs.

227. Wheaton's sincerely held religious beliefs prohibit it from deliberately providing health insurance that would facilitate access to abortifacients, or to related education and counseling. Wheaton's compliance with these beliefs is a religious exercise.

228. Despite being informed in detail of these beliefs beforehand, Defendants designed the Final Mandate and the religious employer exemption to the Final Mandate to target religious organizations like Wheaton because of their religious beliefs.

229. Defendants promulgated both the Final Mandate and its religious employer exemption in order to suppress the religious exercise of Wheaton and others.

230. The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Wheaton's rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

231. Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT IV
### Violation of the First Amendment to the United States Constitution
### Free Exercise and Establishment Clauses
### Discrimination Among Religions and Religious Institutions

232. Wheaton incorporates by reference all preceding paragraphs.

233. The Free Exercise Clause and Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

234. This mandate of equal treatment protects organizations as well as individuals.

235. The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions and religious institutions on the basis of religious views or religious status.

236. The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Wheaton's rights secured to it by the First Amendment of the United States Constitution.

237. Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT V
### Violation of the First Amendment to the United States Constitution
### Selective Burden (*Larson* v. *Valente*)

238. Wheaton incorporates by reference all preceding paragraphs.

239. By design, Defendants imposed the Final Mandate on some religious organizations but not on others, resulting in a selective burden on Wheaton.

240. The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate Wheaton's rights secured to it by the First Amendment of the United States Constitution.

241.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

242.    The Final Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

## COUNT VI

### Interference in Matters of Internal Religious Governance
### Free Exercise Clause and Establishment Clause

243.    Wheaton incorporates by reference all preceding paragraphs.

244.    The Free Exercise Clause and the Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as those of faith and doctrine.

245.    Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, leadership, or doctrine.

246.    Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

247.    Wheaton has made an internal decision, dictated by its Christian faith, that any health plans it makes available to its employees and students may not subsidize, provide, or facilitate access to abortifacient drugs or related services.

248.    The Final Mandate interferes with Wheaton's internal decisions concerning its structure and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its Christian beliefs.

249.    The Final Mandate's interference with Wheaton's internal decisions affects its faith and mission by requiring it to subsidize, provide, and facilitate practices that directly conflict with its religious beliefs.

250.    Because the Final Mandate interferes with Wheaton's internal decision making in a manner that affects its faith and mission, it violates the Establishment Clause and Free Exercise Clause of the First Amendment.

251.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

### COUNT VII
**Religious Discrimination**
**Violation of the First and Fifth Amendments to the United States Constitution**
**Establishment Clause and Due Process**

252.    Wheaton incorporates by reference all preceding paragraphs.

253.    By design, Defendants imposed the Final Mandate on some religious organizations but not on others, resulting in discrimination among religious objectors.

254.    Religious liberty is a fundamental right.

255.    The "religious employer" exemption protects many religious objectors, but not Wheaton.

256.    The "accommodation" provides no meaningful protection for Wheaton.

257.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate Wheaton's rights secured to it by the Establishment Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

258.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT VIII
### Violation of the Fifth Amendment to the United States Constitution
### Due Process and Equal Protection

259.    Wheaton incorporates by reference all preceding paragraphs.

260.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

261.    This mandate of equal treatment protects organizations as well as individuals.

262.    The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

263.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate Wheaton's rights secured to it by the Fifth Amendment of the United States Constitution.

264.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT IX

### Violation of the First Amendment to the United States Constitution
### Freedom of Speech
### Compelled Speech and Compelled Silence

265.    Wheaton incorporates by reference all preceding paragraphs.

266.    Wheaton teaches that abortion and contraception that interferes with the survival of a human embryo violate its religious beliefs.

267.    The Final Mandate would compel Wheaton to subsidize activities that Wheaton teaches are violations of its religious beliefs.

268.    The Final Mandate would compel Wheaton to provide education and counseling related to abortifacients.

269. Defendants' actions thus violate Wheaton's right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

270. The Final Mandate also prevents Wheaton from speaking to its third-party administrator about its religious beliefs and preference that the administrator not provide the services at issue.

271. The Final Mandate's speech restrictions are not narrowly tailored to a compelling governmental interest.

272. Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment to the United States Constitution
Freedom of Speech
Expressive Association**

273. Wheaton incorporates by reference all preceding paragraphs.

274. Wheaton teaches that contraception, sterilization, and abortion violate its religious beliefs.

275. The Final Mandate would compel Wheaton to facilitate activities that Wheaton teaches are violations of its religious beliefs.

276. The Final Mandate would compel Wheaton to facilitate access to government-dictated education and counseling related to abortifacients.

277. Defendants' actions thus violate Wheaton's right of expressive association as secured to it by the First Amendment of the United States Constitution.

278. Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT XI

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

279.     Wheaton incorporates by reference all preceding paragraphs.

280.     By stating that HRSA "may" grant an exemption to certain religious groups, the Final Mandate vests HRSA with unbridled discretion over which organizations can have its First Amendment interests accommodated.

281.     Defendants have exercised unbridled discretion in a discriminatory manner by granting an exemption via footnote in a website for a narrowly defined group of "religious employers" but not for other religious organizations like Wheaton.

282.     Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Final Mandate, despite its conflict with the free exercise of religion.

283.     Defendants' actions therefore violate Wheaton's right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

284.     Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT XII

### Violation of the Administrative Procedure Act
### Lack of Good Cause, Failure to Follow Notice and
### Comment Rulemaking, and Improper Delegation

285.     Wheaton incorporates by reference all preceding paragraphs.

286.     The Affordable Care Act expressly delegates to HRSA, an agency within Defendant HHS, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

287.     Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines with which group health plans and insurers must comply. Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

288.     Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law. Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

289.     The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend. The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

290.     Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

291.     Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

292.     Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

293.    Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented." This failure prejudiced Wheaton.

294.    Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule or the NPRM.

295.    Therefore, Defendants have taken agency action not in observance with procedures required by law, and Wheaton is entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

296.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

**COUNT XIII**

**Violation of the Administrative Procedure Act
Arbitrary and Capricious Action**

297.    Wheaton incorporates by reference all preceding paragraphs.

298.    In promulgating the Final Mandate, Defendants failed to consider the constitutional and statutory implications of the Final Mandate on Wheaton and similar organizations.

299.    Defendants' explanation for its decision not to exempt Wheaton and similar religious organizations from the Final Mandate runs counter to the evidence submitted by religious organizations during the comment period.

300.    Defendant Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially conceded that Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.

301.     Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

302.     Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT XIV

### Violation of the Administrative Procedure Act
### Agency Action Without Statutory Authority

303.     Wheaton incorporates by reference all preceding paragraphs.

304.     Defendants' authority to enact regulations under the Affordable Care Act is limited to the authority expressly granted them by Congress.

305.     Defendants lack statutory authority to coerce insurance issuers and third party administrators to pay for contraceptive and abortifacient services for individuals with whom they have no contractual or fiduciary relationship.

306.     Defendants lack statutory authority to prevent insurance issuers and third party administrators from passing on the costs of providing contraceptive and abortifacient services via higher premiums or other charges that are not "cost sharing."

307.     Defendants lack statutory authority to allow user fees from the federal exchanges to be used to purchase contraceptive and abortifacient services for employees not participating in the exchanges.

308.     Because the Final Mandate's "accommodation" for non-exempt, nonprofit religious organizations lacks legal authority, it is arbitrary and capricious and provides no legitimate protection of objecting organization's First Amendment rights.

309.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT XV

### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law
### Weldon Amendment
### Religious Freedom Restoration Act
### First Amendment to the United States Constitution

310.    Wheaton incorporates by reference all preceding paragraphs.

311.    The Final Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. 110-117, 123 Stat. 3034 (Dec. 16, 2009).[14]

312.    The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

313.    The Final Mandate requires issuers, including Wheaton, to deliberately provide health insurance that facilitates access to all Federal Drug Administration-approved contraceptives.

314.    Some FDA-approved contraceptives cause abortions.

315.    As set forth above, the Final Mandate violates RFRA and the First Amendment.

---

[14] *Available at* http://www.hhs.gov/ocr/civilrights/understanding/ConscienceProtect/ publaw111_117_123_stat_3034.pdf (Ex. J).

316.    Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

317.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## COUNT XVI

**Violation of the Administrative Procedure Act
Agency Action Not in Accordance with Law
Affordable Care Act**

318.    Wheaton incorporates by reference all preceding paragraphs.

319.    The Final Mandate is contrary to the provisions of the Affordable Care Act.

320.    Section 1303 of the Affordable Care Act states that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

321.    Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

322.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

323.    The Final Mandate requires group health plans to provide coverage of all Federal Drug Administration-approved contraceptives.

324.    The Final Mandate requires third-party administrators, like Wheaton's, to provide or contract to provide coverage of all Federal Drug Administration-approved contraceptives.

325.    Some FDA-approved contraceptives cause abortions.

326.    Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

327.    Absent injunctive and declaratory relief against the Final Mandate, Wheaton has been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, Wheaton requests that the Court:

a.    Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Wheaton violate the First Amendment of the United States Constitution;

b.    Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Wheaton violate the Fifth Amendment of the United States Constitution;

c.    Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against Wheaton violate the Religious Freedom Restoration Act;

d.    Declare that the Final Mandate was issued in violation of the Administrative Procedure Act;

e.    Issue a permanent injunction prohibiting Defendants from enforcing the Final Mandate against Wheaton and other organizations that object on religious grounds to providing insurance coverage for abortifacient contraceptives and related education and counseling;

f.    Award Wheaton the costs of this action and reasonable attorney's fees, including but not limited to awarding fees pursuant to 42 U.S.C. § 1988(b); and

g.    Award such other and further relief as it deems equitable and just.

## JURY DEMAND

Wheaton requests a trial by jury on all issues so triable.

Dated: December 13, 2013

Respectfully submitted,


___s/ Christian Poland_____


Christian Mark Poland (N.D. Ill. Bar No. 90784475)
Bryan Cave LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601-3315
(312) 602-5085
christian.poland@bryancave.com

Mark Rienzi (DC Bar No. 494336)
  (*pro hac vice* application to be filed)
Adèle Auxier Keim (VA Bar No. 76476)
  (*pro hac vice* application to be filed)
The Becket Fund for Religious Liberty
3000 K St. NW, Suite 220
Washington, DC 20007
(202) 955-0095
(202) 955-0090
mrienzi@becketfund.org

*Counsel for Plaintiff, Wheaton College*