**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

WHEATON COLLEGE,

      *Plaintiff,*

v.

KATHLEEN SEBELIUS, Secretary
of the United States Department of
Health and Human Services,
UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
THOMAS PEREZ, Secretary
of the United States Department of Labor,
UNITED STATES DEPARTMENT OF
LABOR,
JACOB LEW,  Secretary of the United
States Department of the Treasury, and
UNITED STATES DEPARTMENT OF
THE TREASURY,

      *Defendants.*

No. 1:13-cv-8910

Judge Robert M. Dow, Jr.
Magistrate Judge Sidney I. Schenkier

**WHEATON COLLEGE'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR
SUMMARY JUDGMENT AND DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARDS ........................................................................................................ 7

ARGUMENT ..................................................................................................................... 8

I.  Wheaton is entitled to summary judgment ..................................................................... 8

    A.  The Mandate violates the Religion Clauses................................................................ 9

    B.  The Mandate violates the Administrative Procedures Act ........................................... 12

    C.  The Mandate violates Wheaton's Free Speech rights ................................................. 14

        1.  The Mandate forces Wheaton to speak against its will, and in a way that
            contradicts its beliefs................................................................................... 14

        2.  The Mandate compels Wheaton to be silent on specific topics to specific
            audiences................................................................................................... 16

    D.  The Mandate violates the Religious Freedom Restoration Act ..................................... 19

        1.  Wheaton's abstention from facilitating access to abortifacient products is
            sincere religious exercise .............................................................................. 20

        2.  The Mandate imposes a substantial burden of enormous fines on Wheaton's
            religious exercise of abstention...................................................................... 20

        3.  The Mandate cannot survive strict scrutiny .................................................... 24

            a.  The government has identified no compelling interest.......................... 24

            b.  The government has numerous less restrictive means of furthering its
               interests ....................................................................................... 27

II.  The remainder of the claims in the government's motion to dismiss and for
    summary judgment should be denied ...................................................................... 30

    A.  The Mandate violates Wheaton's Free Exercise rights................................................. 30

i

B.  The Mandate violates Wheaton's right to expressive association ....................................32

C.  The Mandate unconstitutionally discriminates ................................................................33

D.  The Mandate violates the Administrative Procedure Act ...............................................34

    1.  Defendants failed to follow notice-and-comment procedures ....................................34

    2.  The Mandate is arbitrary and capricious ...................................................................36

    3.  The Mandate violates governing law ........................................................................36

    4.  The Mandate exceeds statutory authority ..................................................................37

III. Summary judgment is premature on Wheaton's intentional discrimination claims
     and its APA claims ................................................................................................................38

CONCLUSION AND REQUEST FOR ORAL ARGUMENT .....................................................38

CERTIFICATE OF SERVICE ......................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ................................................................................................. 16

*Agency for Int'l Dev. v. AOSI*,
133 S. Ct. 2321 (2013) ...................................................................................... 14, 15

*Amnesty Int'l, USA v. Battle*,
559 F.3d 1170 (11th Cir. 2009) ............................................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................................. 7

*Archdiocese of N.Y. v. Sebelius*,
No. 12-cv-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) ......................... 9, 27

*Ave Maria Found. v. Sebelius*,
No. 2:13-cv-15198, 2014 WL 117425 (E.D. Mich. Jan. 13, 2014) ......................... 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 8

*Bloch v. Frischholz*,
587 F.3d 771 (7th Cir. 2009) ................................................................................. 30

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) .......................................................................................... 22, 23

*Bridenbaugh v. Freeman-Wilson*,
227 F.3d 848 (7th Cir. 2000) ........................................................................... 22, 37

*Catholic Diocese of Beaumont v. Sebelius*,
No. 1:13-cv-709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014) ................................... 8

*Catholic Diocese of Nashville v. Sebelius*,
No. 13-6640 (6th Cir. Dec. 31, 2013) ..................................................................... 8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ...................................................................................... 25, 30, 31

*Colo. Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) ..................................................................... passim

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ................................................................................................ 21

*DeBoer v. Vill. of Oak Park*,
267 F.3d 558 (7th Cir. 2001) ................................................................................. 15

*Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius*,
No. 1:12-cv-159, 2013 WL 6843012 (N.D. Ind. Dec. 27, 2013) ............................ 9

*E. Tex. Baptist Univ. v. Sebelius*,
No. 12-cv-3009, 2013 WL 6838893 (S.D. Tex. Dec. 27, 2013) .............................. 8

*Entm't Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .......................................................................... 14, 16

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .......................................................................... 22, 37

*FCC v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003) .......................................................................................... 13

*Fraternal Order of Police v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) ............................................................................. 31

*Frudden v. Pilling*,
742 F.3d 1199 (9th Cir. 2014) .......................................................................... 15

*Geneva Coll. v. Sebelius*,
No. 2:12-cv-00207, 2013 WL 6835094 (W.D. Pa. Dec. 23 2013) ......................... 9

*Gonzales v. O Centro*,
546 U.S. 418 (2006) ................................................................................ 19, 24, 26

*Grace Schools v. Sebelius*,
No. 3:12-CV-459, 2013 WL 6842772 (N.D. Ind. Dec. 27, 2013) .......................... 9

*Griswold v. Connecticut*,
381 U.S. 479 (1965) .......................................................................................... 25

*Grote v. Sebelius*,
708 F.3d 850 (7th Cir. 2013) ............................................................................. 27

*Hinrichs v. Speaker of the House*,
506 F.3d 584 (7th Cir. 2007) .......................................................................... 9, 30

*Hobby Lobby v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ......................................................................... 25

*Hoctor v. U.S. Dep't of Agric.*,
82 F.3d 165 (7th Cir. 1996) ........................................................................... 34, 35

*In re Union Pac. R.R. Emp't Practices Litig.*,
479 F.3d 936 (8th Cir. 2007) ............................................................................. 25

*In re United Air Lines, Inc.*,
453 F.3d 463 (7th Cir. 2006) .............................................................................. 7

*Jamie S. v. Milwaukee Pub. Sch.*,
668 F.3d 481 (7th Cir. 2012) ............................................................................. 37

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ..................................................................... passim

*Larson v. Valente*,
456 U.S. 228 (1982) ....................................................................................... 9, 10

*Legatus v. Sebelius*,
No. 2:12-cv-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013) ..................... 9

*McCutcheon v. Fed. Election Comm'n,*
   134 S. Ct. 1434 (2014) .......................................................................................... 29

*Michigan Catholic Conference v. Sebelius,*
   No. 13-2723 (6th Cir. Dec. 31, 2013) ..................................................................... 8

*Monsanto Co. v. E.P.A.,*
   19 F.3d 1201 (7th Cir. 1994) ........................................................................... 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
   463 U.S. 29 (1983) ..................................................................................... 13, 14, 36

*Nw. Tissue Ctr. v. Shalala,*
   1 F.3d 522 (7th Cir. 1993) .................................................................................... 35

*Peate v. McCann,*
   294 F.3d 879 (7th Cir. 2002) ................................................................................ 38

*Persico v. Sebelius,*
   No. 1:13-cv-00303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) ........................... 9

*Pfizer Inc. v. Apotex Inc.,*
   726 F. Supp. 2d 921 (N.D. Ill. 2010) .................................................................. 7, 8

*Priests for Life v. Health & Human Servs.,*
   No. 13-5368 (D.C. Cir. Dec. 31, 2013) ................................................................... 8

*Prof'l Towing & Recovery Operators of Illinois v. Box,*
   965 F. Supp. 2d 981 (N.D. Ill. 2013) ...................................................................... 7

*Reaching Souls Int'l, Inc. v. Sebelius,*
   No. 5:13-cv-1092-D, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013) ..................... 9

*Riley v. Nat'l Fed'n of the Blind,*
   487 U.S. 781 (1988) ..................................................................................... 14, 28, 29

*Roman Catholic Archbishop of Wash. v. Sebelius,*
   No. 13-1441, 2013 WL 6729515 (D.D.C. Dec. 20, 2013) ...................................... 18

*Roman Catholic Archbishop of Washington v. Sebelius,*
   No. 13-5371 (D.C. Cir. Dec. 31, 2013) ................................................................... 8

*Roman Catholic Diocese of Fort Worth v. Sebelius,*
   No. 4:12-cv-00314 (N.D. Tex. Dec. 31, 2013) ...................................................... 18

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) ......................................................................................... 14, 25

*Schultz v. City of Cumberland,*
   228 F.3d 831 (7th Cir. 2000) ................................................................................ 18

*Sharpe Holdings, Inc. v. United States Dep't of Health & Human Srvs.,*
   No. 2:12-cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013) ................................ 8

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ..................................................................................... 19, 20

*Smith v. Executive Dir. of Ind. War Memorials Comm'n,*
   742 F.3d 282 (7th Cir. 2014) ............................................................. 34

*Southern Nazarene Univ. v. Sebelius,*
   No. 5:13-cv-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013) ......... 9

*St. Agnes Hospital of the City of Baltimore, Inc. v. Riddick,*
   748 F. Supp. 319 (D. Md. 1990) ......................................................... 21

*Taniguchi v. Kan Pacific Saipan, Ltd.,*
   132 S. Ct. 1997 (2012) ....................................................................... 37

*TBS, Inc. v. FCC,*
   512 U.S. 622 (1994) ........................................................................... 18

*Thomas v. Review Bd.,*
   450 U.S. 707 (1981) ........................................................................... 20

*U.S. West, Inc. v. FCC,*
   182 F.3d 1224 (10th Cir. 1999) .......................................................... 18

*United States v. Playboy Entm't Grp.,*
   529 U.S. 803 (2000) ..................................................................... 15, 27

*United States v. United Foods Inc.,*
   533 U.S. 405 (2001) ........................................................................... 16

*University of Notre Dame v. Sebelius,*
   743 F.3d 547 (7th Cir. 2014) ........................................................ passim

*W. Virginia State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ........................................................................... 15

*Wheaton v. Sebelius,*
   No. 1:12-cv-01169 (D.D.C. July 18, 2012) .......................................... 26

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ..................................................................... 19, 20

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ........................................................................... 15

*World Outreach Conference Ctr. v. City of Chicago,*
   591 F.3d 531 (7th Cir. 2009) .............................................................. 33

*Zubik v. Sebelius,*
   No. 2:13-cv-01459, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) .... 19, 31

   **Statutes**

APA, 5 U.S.C. § 553 *et seq.* ............................................................. passim

RFRA, 42 U.S.C. § 2000bb-1 *et seq.* ................................................ passim

5 U.S.C. § 706 .................................................................................... 13

26 U.S.C. § 4980D ............................................................................................. 4, 7, 23

26 U.S.C. § 4980H ..................................................................................................... 4

26 U.S.C. § 5000A ................................................................................................... 25

29 U.S.C. § 1132 ...................................................................................................... 23

42 U.S.C. § 18011 ..................................................................................................... 4

42 U.S.C. § 18023 ................................................................................................... 36

42 U.S.C. § 2000cc-5 .............................................................................................. 20

42 U.S.C. § 2000e-1 ............................................................................................... 13

42 U.S.C. § 254b ..................................................................................................... 28

42 U.S.C. § 300gg-13 ......................................................................................... 3, 34

Consolidated Appropriations Act of 2012,
     Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1) & (2), 125 Stat. 786 (2011) ............................ 36

**Regulations**

26 C.F.R. § 1.6033-2 ............................................................................................... 10

26 C.F.R. § 54.9815-2713A ............................................................................... 14, 16

29 C.F.R. § 2590.715-1251 ...................................................................................... 4

45 C.F.R. § 147.131 .......................................................................................... passim

45 C.F.R. § 156.50 .................................................................................................... 6

45 C.F.R. § 147.130 ................................................................................................ 35

76 Fed. Reg. 46621 (Aug. 3, 2011) ......................................................................... 35

77 Fed. Reg. 16501 (March 21, 2012) ...................................................................... 4

78 Fed. Reg. 39870 (July 2, 2013) ...................................................................... passim

78 Fed. Reg. 72322 (Dec. 2, 2013) .......................................................................... 6

**Rules**

Fed.R.Civ.P. 56 .................................................................................................. 7, 38

**Other Authorities**

CCCU, Members and Affiliates,
    https://www.cccu.org/members_and_affiliates ......................................................... 12

CCCU, Profile of U.S. Post-Secondary Education,
    https://www.cccu.org/about ......................................................................................... 12

HRSA, Find A Health Center,
    findahealthcenter.hrsa.gov .......................................................................................... 28

Michael S. Hamilton, *Evangelical Entrepreneurs: the Parachurch Phenomenon,*
    CHRISTIAN HISTORY (Oct. 1, 2006), *available at*
    http://www.christianitytoday.com/ch/2006/issue92/6.33.html ........................... 10-11

*Religious Freedom Restoration Act of 1991: Hearings before the Subcomm. on Civil &*
    *Constitutional Rights of the H. Comm. On Judiciary,*
    102d Cong. 340 (1993) ................................................................................................ 21

*Stedman's Medical Dictionary* 4 (28th ed. 2006) ........................................................ 37

viii

### INTRODUCTION

For more than 150 years, Wheaton College has operated as a community of Christian believers living, working, and learning together according to their shared Christian faith. Until the instant controversy, however, Wheaton has never been forced by the government to choose between violating that shared Christian faith and violating the law.

Yet on July 1, 2014, Wheaton will lose the right to decide for itself whether or not to offer insurance coverage for emergency contraceptives such as Plan B (also known as the "morning after pill") and ella (also known as the "week after pill"). Without an injunction from this Court, the federal government will soon begin punishing Wheaton for its religious refusal to provide these products in its employee and student health plans. In fact, because Wheaton can neither directly provide such coverage nor execute and deliver forms designating others to do so, Wheaton faces as much as $34.8 million in fines in the next year alone.

None of this is necessary, or even rational. The government has exempted plans covering tens of millions of people from the exact same requirement at issue here. And of course the government has innumerable ways to provide emergency contraceptives or emergency contraceptive coverage directly to anyone who wants them, such as through Title X funding, through tax credits, or through participation in state and federal exchanges.

Indeed, in virtually every similar case in the nation, the religious non-profit plaintiff has received a preliminary or permanent injunction protecting it from being forced to violate its beliefs in this manner.[1] One of those preliminary injunctions was granted by the Supreme Court under the All Writs Act, reversing the decision of a Tenth Circuit panel. Ex. B-1 (Order, *Little Sisters of the*

---

[1] Counsel for Plaintiff keeps reasonably updated records of the cases at http://www.becketfund.org/hhsinformationcentral/.

1

*Poor v. Sebelius*, No. 13A691 (U.S. Jan. 24, 2014)). Of twenty-one such cases, the lone exception is *University of Notre Dame v. Sebelius*, where the Seventh Circuit affirmed the denial of a preliminary injunction in a "limit[ed]" and "tentative" decision based on an evidentiary record that was different from this case and was otherwise "virtually a blank." 743 F.3d 547, 552 (7th Cir. 2014).

The Seventh Circuit has expressly instructed that "*everything* we say in this opinion about the merits of Notre Dame's claim . . . is necessarily tentative, and *should not be considered a forecast of the ultimate resolution of this still so young litigation*." *Id.* (emphasis supplied). That opinion—which does not even control in the *Notre Dame* case—certainly does not control here, where the facts are much more akin to those in the twenty other decided HHS Mandate cases brought by non-profits, all of which have resulted in preliminary or permanent injunctions.[2] Indeed, for institutions like Wheaton—which, unlike Notre Dame, limits its hiring to those who share its own faith—the government has already conceded that an exemption "does not undermine the governmental interests furthered by the contraceptive coverage requirement." 78 Fed. Reg. 39870, 39874 (July 2, 2013).

The same result is appropriate here. The government's Mandate is impermissible under the First Amendment, the Administrative Procedure Act, and the Religious Freedom Restoration Act. For these reasons, Wheaton College respectfully requests that this Court grant summary judgment in Wheaton's favor and issue an injunction against the federal regulations that, as of July 1, 2014, will require it to either provide emergency contraceptives to its employees or designate someone

---

[2] For example, Notre Dame had already signed the form at issue, prompting the panel to note "An initial puzzle is that the university hasn't told us what exactly it wants enjoined at this stage in the litigation." *Notre Dame*, 743 F.3d at 552. Wheaton, by contrast, has not signed the form and seeks an injunction protecting it from being forced to do so. Ryken Decl. ¶¶ 3, 43-45.

else to do so. For the same reasons, the Court should deny the government's motion to dismiss or, in the alternative, for summary judgment.

As discussed at the status conference, Wheaton respectfully requests this relief with some urgency. While the fines will commence on July 1, Wheaton's employees, students, and administrators need to know the status of Wheaton's plans as soon as possible.

## BACKGROUND

Wheaton College is a Christian liberal arts college located in Wheaton, Illinois and founded in 1860 by abolitionist Jonathan Blanchard. Ryken Decl. ¶ 5. Wheaton holds and follows traditional Christian beliefs about the sanctity of life. Ryken Decl. ¶¶ 17-19. All members of Wheaton's community assent to Wheaton's religious beliefs, including its beliefs about the sanctity of life. Ryken Decl. ¶¶ 14, 16. Wheaton does not object to traditional contraception (i.e., contraceptives that work before fertilization) but is religiously opposed to emergency contraceptives because they may act by killing a human embryo. Ryken Decl. ¶ 41.

The Affordable Care Act ("ACA") mandates that any "group health plan" must provide coverage for certain "preventive care" without "any cost sharing." 42 U.S.C. § 300gg-13(a). The Department of Health and Human Services ("HHS") defined women's preventive care to include all FDA-approved contraceptive methods, including "emergency contraception" such as Plan B (the "morning-after" pill) and ella (the "week-after" pill).[3] FDA's Birth Control Guide notes that these drugs may work by preventing "attachment (implantation)" of a fertilized egg in the uterus.[4] Failure to provide this coverage triggers a variety of penalties, including crippling daily and annual

---

[3] Ex. B-2 (HHS, Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines/).

[4] Ex. B-3 (FDA, Birth Control: Medicines to Help You, http://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm).

penalties. *See, e.g.*, 26 U.S.C. § 4980D(b)(1) ($100 per day per individual); 26 U.S.C. § 4980H(c)(1) ($2000 per employee, per year).

Many employers are exempt from the Mandate and need not provide the objectionable coverage nor designate someone else to do so for them. Employers who provide "grandfathered" health care plans, which cover tens of millions of Americans, are exempt from the Mandate, and neither they nor their insurers need cover contraceptives. *See* 42 U.S.C. § 18011. Employers with fewer than fifty employees, covering an estimated 31 million Americans, also may avoid fines under the Mandate by not offering insurance at all. *See* 26 U.S.C. § 4980H(c)(2)(A); 26 U.S.C. § 4980D(d). "Religious employers"—defined narrowly to include institutional churches and their dependent organizations—are also exempt from the Mandate. 78 Fed. Reg. at 39874; 45 C.F.R. § 147.131(a). "Religious employers" are automatically exempt; they are not required to certify their religious beliefs to anyone or designate anyone else to comply with the Mandate in their place, and their insurers are free to continue providing conscience-compliant benefits as before. *Id.*

For all other religious non-profit organizations—including Wheaton—the government created what it calls an "accommodation" designed to "assur[e] that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing." 77 Fed. Reg. 16501, 16503 (March 21, 2012). In addition to a grandfathered PPO plan that is self-funded, Wheaton has two insured HMO plans and two self-funded prescription drug plans.[5] Ryken Decl. ¶ 22. Wheaton also offers an insured student health plan. Ryken Decl. ¶ 29.

---

[5] Most of Wheaton's employees are on one of Wheaton's two ungrandfathered HMO plans. Ryken Decl. ¶ 27. Wheaton cannot simply shift all of the employees that are currently on the less-expensive HMO plan to the grandfathered PPO, because this would violate the government's grandfathering regulations and could have the effect of ungrandfathering the entire PPO plan. Ryken Decl. ¶ 70; *see also* 29 C.F.R. § 2590.715-1251(b)(2).

With respect to Wheaton's insured employee and student health plans, the Mandate effectively outlaws the conscience-compliant health insurance that Wheaton wishes to purchase—that is, insurance that does not include emergency contraceptives. Before the Mandate, Wheaton could purchase insurance that excluded the contraceptive methods to which it objects. Starting on July 1, however, Wheaton cannot purchase such insurance, but churches, their integrated auxiliaries, and employers with grandfathered plans remain free to do so. Instead, Wheaton must purchase insurance that includes these contraceptive methods and then execute and deliver the government's self-certification form, described below, to its insurers—who will then provide the emergency contraceptives to Wheaton's students and employees.

With respect to its self-funded prescription drug plans, Wheaton must also sign and deliver a government-created form to its third party administrator ("TPA"), giving it the legal authority to provide contraceptives to Wheaton's employees at no cost.[6] 78 Fed. Reg. at 39867, 39880. The form is essential because even today, under the contract between Wheaton and its TPA, Wheaton is the plan administrator and fiduciary, and Wheaton's TPA has no authority to change the terms of the plan without Wheaton's express permission. Ryken Decl. ¶ 23, 54; Ex. A-3 (Administrative Services Agreement).[7] Wheaton here seeks an injunction protecting it from being forced to submit the form and alter that contract.

The government's authorization form is called EBSA Form 700 and includes the following legally operative language:

---

[6] Because Wheaton's PPO is grandfathered, Wheaton will not have to make this choice with regard to its PPO plan at this juncture. The regulations do, however, apply to Wheaton's self-insured prescription drug plans.

[7] In *Notre Dame*, the panel noted that such documents were absent and this argument had been "forfeited." 743 F.3d at 555.

> The organization or its plan must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.
>
> <u>Notice to Third Party Administrators of Self-Insured Health Plans</u>
>
> In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2590.715-2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:
>
> (1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and
>
> (2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.
>
> This certification is an instrument under which the plan is operated.

Ex. B-4. By means of this language, the Form (a) directs the TPA to portions of the Mandate that require that the TPA "shall provide" payments for contraceptive services, (b) instructs the TPA that these regulations set forth the TPA's "obligations," and (c) purports to make the Form, including the Notice section thereof, "an instrument under which the plan is operated."

With respect to self-funded plans, tendering this Form creates for the TPA a right to break its contract with Wheaton rather than provide the coverage, but Wheaton is forbidden from saying or doing anything to "influence" the TPA's decision either way. 78 Fed. Reg. at 39879-80 (the "gag rule"). And to induce TPAs to provide the coverage, the government also offers a "carrot": the TPA may use Wheaton's authorization form to seek government reimbursement plus a fifteen percent increase to cover "margin." 45 C.F.R. § 156.50; 78 Fed. Reg. 72322, 72364 (Dec. 2, 2013).

Wheaton believes that signing and delivering EBSA Form 700 to its insurer and TPA would make it morally complicit in the wrongful destruction of human life. Ryken Decl. ¶ 56. Complying with the accommodation's gag rule would prevent Wheaton from speaking freely about its objections to life-ending emergency contraceptives or instructing its TPA to provide some contraceptives but not others. Ryken Decl. ¶ 48. Yet if Wheaton refuses to comply by July 1, 2014,

it will be subject to annual penalties that could be as high as $34.8 million (if it continues to offer health coverage) or $1.3 million (if it does not).[8] *Id.* This is a substantial—indeed, severe—burden on Wheaton's religious exercise. Worse, the burden is entirely unnecessary in light of the government's concessions in the Federal Register that the government's interest is not threatened by exempting employers and schools who, like Wheaton, limit their hiring and student body to their co-religionists. 78 Fed. Reg. at 39874.

## LEGAL STANDARDS

"Summary judgment is proper if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Prof'l Towing & Recovery Operators of Illinois v. Box*, 965 F. Supp. 2d 981 (N.D. Ill. 2013) (Dow, J.) (quoting Fed.R.Civ.P. 56(a)). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 990 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "On cross-motions for summary judgment, the Court construes all facts and inferences 'in favor of the party against whom the motion under consideration is made.'" *Id.* at 989 (quoting *In re United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006)).

"A Rule 12(b)(6) motion tests the sufficiency of the complaint . . . while a Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction." *Pfizer Inc. v. Apotex Inc.*, 726 F. Supp. 2d 921, 927 (N.D. Ill. 2010) (Dow, J.) (internal citations omitted). "In reviewing a motion to dismiss under either rule, the Court takes as true all factual allegations in [the plaintiff's complaint] and draws all reasonable inferences in its favor." *Id.*

---

[8] These are estimates, as Defendants have not provided adequate guidance on who qualifies as an "individual to whom such failure relates" for purposes of the $100 per day fines in 26 U.S.C. § 4980D, nor how these fines, which apply to "group health plan[s]," might apply to student health plans.

To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide a "short and plain statement of the claim," and allege facts that state a facially plausible claim to relief. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss under Rule 12(b)(1), "the party asserting the claims bears the burden of proving that the jurisdictional requirements have been met." *Id.* In either case, the "purpose of a motion to dismiss is not to decide the merits of the case." *Id.*

ARGUMENT

## I. Wheaton is entitled to summary judgment.

Wheaton is entitled to summary judgment because the Mandate violates the First Amendment's Religion Clauses, the Administrative Procedure Act, the First Amendment's Free Speech Clause, and the federal Religious Freedom Restoration Act. The government concedes that these are all legal claims and that no discovery is needed. Doc. 37, Joint Status Report at 6 (government statement that "[t]here are no factual issues in dispute in this case"). Any one of these grounds, standing alone, would be sufficient to enter an order protecting Wheaton from the Mandate. And indeed, apart from the "tentative" *Notre Dame* decision, federal courts have granted preliminary or permanent injunctions in *every single* religious non-profit Mandate challenge decided to date.[9]

_____

[9] **Supreme Court:** Ex. B-1, Order, *Little Sisters of the Poor v. Sebelius*, No. 13A691 (S. Ct. Jan. 24, 2014) (injunction pending appeal).

**Courts of Appeals:** *Priests for Life v. Health & Human Servs.*, No. 13-5368 (D.C. Cir. Dec. 31, 2013) (injunction pending appeal); *Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-5371 (D.C. Cir. Dec. 31, 2013) (same); *Michigan Catholic Conference v. Sebelius*, No. 13-2723 (6th Cir. Dec. 31, 2013) (same); *Catholic Diocese of Nashville v. Sebelius*, No. 13-6640 (6th Cir. Dec. 31, 2013) (same).

**District Courts:** *Ave Maria Found. v. Sebelius*, No. 2:13-cv-15198, 2014 WL 117425 (E.D. Mich. Jan. 13, 2014) (preliminary injunction); *Catholic Diocese of Beaumont v. Sebelius*, No. 1:13-cv-709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014) (permanent injunction); *Roman Catholic Diocese of Fort Worth v. Sebelius*, No. 4:12-cv-00314 (N.D. Tex. Dec. 31, 2013) (preliminary injunction); *Sharpe Holdings, Inc. v. United States Dep't of Health & Human Srvs.*, No. 2:12-cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013) (same); *E. Tex. Baptist Univ. v. Sebelius*, No. 12-cv-3009, 2013 WL 6838893 (S.D. Tex. Dec. 27, 2013)

8

### A. The Mandate violates the Religion Clauses.

The Mandate violates the Religion Clauses because it impermissibly discriminates among religious institutions asserting the exact same religious objection. Some favored "religious employers" are exempt from the Mandate and the requirement to execute EBSA Form 700. Yet others like Wheaton, who wish to engage in the exact same religious exercise as "religious employers," are forced to comply or pay massive penalties.

The Mandate's "explicit and deliberate distinctions between different religious organizations"—giving exemptions to some religious organizations but not to others engaged in the exact same religious exercise—violate both the Free Exercise and Establishment Clause. *See Larson v. Valente*, 456 U.S. 228, 246-47 & n.23 (1982); *Hinrichs v. Speaker of the House*, 506 F.3d 584, 588 (7th Cir. 2007) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). *Larson* invalidated a Minnesota law that imposed disclosure requirements on religious organizations that did not "receive[ ] more than half of their total contributions from members or affiliated organizations." 456 U.S. at 231-32. The law thus exempted established, self-supported churches, while targeting churches that relied on outside donations. *Id.* at 246 n.23; *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (McConnell, J.) (explaining that the law in *Larson* "discriminated against religions . . . that depend heavily on soliciting donations from the general

---

(permanent injunction); *Grace Schools v. Sebelius,* No. 3:12-CV-459, 2013 WL 6842772 (N.D. Ind. Dec. 27, 2013) (preliminary injunction); *Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius*, No. 1:12-cv-159, 2013 WL 6843012 (N.D. Ind. Dec. 27, 2013) (same); *Geneva Coll. v. Sebelius,* No. 2:12-cv-00207, 2013 WL 6835094 (W.D. Pa. Dec. 23 2013) (same); *Southern Nazarene Univ. v. Sebelius*, No. 5:13-cv-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013) (same); *Reaching Souls Int'l, Inc. v. Sebelius,* No. 5:13-cv- 1092-D, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013) (same); *Legatus v. Sebelius,* No. 2:12-cv-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013) (same); *Archdiocese of N.Y. v. Sebelius*, No. 12-cv-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) (same); *Persico v. Sebelius*, No. 1:13-cv-00303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) (same); *Zubik v. Sebelius*, No. 2:13-cv-01459, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013) (same).

public"). This was an "explicit and deliberate distinction[] between different religious organizations," one that failed strict scrutiny and violated the Establishment Clause. *Larson*, 456 U.S. at 246 n.23, 255.

The discrimination among religious organizations in this case is even less defensible than the program invalidated in *Larson*. Rather than creating its own criteria for the religious employer exemption, HHS borrowed the strict rules that the IRS uses for the completely unrelated purpose of determining which religious organizations are exempt from reporting their income. Only religious organizations that are institutional churches or are controlled by an institutional church may qualify for this narrow IRS exemption. *See* 26 C.F.R. § 1.6033-2 (requiring exempt religious organizations, *inter alia*, to have officers "appoint[ed] or remove[ed]" by a church.). And under the IRS' rules, an exempt religious organization must not "normally receive[] more than 50 percent of its support" from a non-church sources—a qualification that closely parallels the criteria condemned in *Larson*. *Compare* 26 C.F.R. § 1.6033-2 (h)(2)-(4) *with Larson*, 456 U.S. at 230 (law "impos[ed] certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers").

These rules dramatically disadvantage universities like Wheaton, who share the exact same religious beliefs and seek to engage in the exact same religious exercise as thousands of exempt churches. For religious and historical reasons, although they remain closely associated with the many churches that share their Evangelical Protestant beliefs, Evangelical colleges like Wheaton are less likely to have the kinds of close financial and administrative ties to a particular church that the IRS reporting rules require.[10] The IRS's strict rules may be justified in the income reporting

---

[10] Since at least the nineteenth century, Evangelicals in America have favored non-denominational organizations because of their ability to foster cooperation between members of different churches that share common religious convictions. *See, e.g.,* Michael S. Hamilton, *Evangelical Entrepreneurs: the Parachurch Phenomenon,* CHRISTIAN HISTORY (Oct. 1, 2006), *available at*

context, but they are completely unjustified as a limitation on the exercise of religious liberty, as Defendants seek to use them here. By structuring the exemption in this way, the Mandate engages in "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Weaver*, 534 F.3d at 1259 (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations). This is forbidden by the Religion Clauses.

The government does not deny that it has engaged in this type of discrimination. Instead, the final regulations claim that such discrimination is permitted because (a) the government concedes that its interest is *not* implicated by employers who limit their hiring to their co-religionists, and (b) the government assumed (without evidence) that religious non-profits like Wheaton do not so limit their hiring. *See* 78 Fed. Reg. at 39874. The government's rationale is entirely wrong with regard to Wheaton, whose employees and students each sign a community covenant establishing standards for belief and conduct consistent with Wheaton's commitment to the sanctity of life. Ryken Decl. ¶¶ 14, 16. Moreover, in parallel litigation, the government has conceded that there is "no evidence" to support Defendants' speculation that employees of religious organizations like Wheaton "are more likely not to object to the use of contraceptives."[11] In fact, the evidence before the government was to the contrary. During their rulemaking, Defendants received comments from the Council for Christian Colleges and Universities ("CCCU"), which represents 120 Evangelical Protestant colleges and universities, including Wheaton (or nearly 15% of the 900 religiously-

---

http://www.christianitytoday.com/ch/2006/issue92/6.33.html. Consistent with this tradition, Wheaton is not financially or administratively controlled by a particular church, although it shares common religious convictions with many Evangelical Protestant churches. Ryken Decl. ¶ 9.

[11] Ex. B-5 (Cohen Dep. Trans. at 34:9-24, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, Doc. 51-1, No. 1:13-cv-00303 (E.D.N.Y. Nov. 12, 2013) (Deposition Transcript of Gary M. Cohen, Defendants' Rule 30(b)(6) Designee, Director of the Center for Consumer Information and Insurance Oversight in the Centers for Medicare and Medicaid Services)).

affiliated institutions of higher education in the United States).[12] CCCU pointed out that the

Defendants' rationale did not apply to CCCU's Evangelical Protestant members:

> The CCCU is particularly frustrated by that rationale for the exemption-accommodation paradigm, **because a requirement for membership in the CCCU is that full-time administrators and faculty at our institutions share the Christian faith of the institution**. Obviously our administrators and faculty do share the deeply held religious convictions of their employers, contrary to the Department's view. Ironically, churches, on the other hand, some of which do not hire only Christians, remain exempt in this scheme. This exposes why this is not a coherent criterion – rather, the religious mission of the organization should drive the distinction.[13]

The government's decision to press ahead with its narrow church-focused exemption in the face

of such evidence created "a puzzling and wholly artificial distinction" that the First Amendment

cannot countenance. *Weaver*, 534 F.3d at 1259-60.

Simply put, the government has denied Wheaton an exemption because Wheaton is not

financially or administratively controlled by a particular church and based on the government's

unfounded assumptions about the religious beliefs of Wheaton's students and employees. The

government has no authority to dole out religious liberty rights based on its guesses about how

religious a religious organization's employees are. The First Amendment forbids such

discrimination, and certainly cannot countenance such discrimination in the face of undisputed

facts showing that the underlying assumptions are false.

### B.  The Mandate violates the Administrative Procedures Act.

For related reasons, the Mandate violates the APA because it is arbitrary and capricious and

contrary to law.  "The [APA] requires federal courts to set aside federal agency action that is 'not

---

[12]  CCCU, Profile of U.S. Post-Secondary Education, https://www.cccu.org/about; CCCU, Members and Affiliates, https://www.cccu.org/members_and_affiliates.

[13]  Ex. B-6 (CCCU NPRM Comments at 4-5 (Apr. 8, 2013) (emphasis in original), AR CMS-2012-0031-82670-A1).

in accordance with law,' . . . which means, of course, any law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc*., 537 U.S. 293, 300 (2003) (5 U.S.C. § 706(2)(A)). Congress has deliberately required religious exemptions for religious objectors like Wheaton College in RFRA, 42 U.S.C. § 2000bb-1 *et seq.*, and has even granted them the ability to limit hiring based on religion through Title VII, 42 U.S.C. § 2000e-1. The agencies have no authority to carve out a religious exemption that is smaller than the robust exemptions that Congress has already granted.

A rule is arbitrary and capricious "if the agency has . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence" before the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983); *accord Monsanto Co. v. E.P.A*., 19 F.3d 1201, 1207 (7th Cir. 1994) (holding that an agency decision was arbitrary and capricious where a regulated company "clearly informed" the agency that one of its key assumptions was invalid, and the agency nevertheless acted on that assumption). As just discussed, the government "offered an explanation for its decision" to limit the religious employer exemption to churches and church-like institutions that both suggests that Wheaton *should* get an exemption, and "that runs counter to the evidence before the agency." *Monsanto*, 19 F.3d at 1207. Defendants claimed that the church-focused religious employer exemption was justified because church employees were more likely than the employees of other religious non-profits to agree with their employers' religious views. 78 Fed. Reg. at 39874. But that is simply not true, and Defendants knew it because the CCCU informed them of it. Ex. B-6 at 4. And the government made no effort to connect the IRS rules it adopted—designed for the very different purpose of determining which religious organizations are exempt from IRS income reporting requirements—with the purposes behind the Mandate. In short, when enacting the Mandate and exemption, Defendants ignored key

aspects of the problem before them, relied on misinterpretations of facts and laws, and relied on false assumptions about the religious beliefs of employees at Evangelical Protestant institutions like Wheaton. That violates the APA. *See Monsanto*, 19 F.3d at 1207; *Motor Vehicle*, 463 U.S. at 43.

### C. The Mandate violates Wheaton's Free Speech rights.

The First Amendment protects Wheaton's rights to be free from government efforts to compel its speech, and to compel its silence. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988) ("First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). The Mandate violates both rights.

### 1. The Mandate forces Wheaton to speak against its will, and in a way that contradicts its beliefs.

The proposed accommodation requires Wheaton to sign and deliver EBSA Form 700, Ex. B-4, to its insurers and TPAs, which states that they are *authorized* and *obligated* to offer objectionable drugs and services. Ex. B-4 (citing 26 C.F.R. § 54.9815-2713A(b)(2); 26 C.F.R § 54.9815-2713A(c)(2)(b)); *see also* 45 C.F.R. § 147.131 (b)(4), (c). This statement triggers payments for the use of abortifacient drugs and services, including for "education and counseling" about those products to Wheaton's plan participants. Ryken Decl. ¶ 64; 26 C.F.R. § 54.9815-2713A(b)(2); 26 C.F.R § 54.9815-2713A(c)(2)(b). Wheaton is forbidden by its religion from engaging in such speech: speech furthering a message and activities that contradict its public witness to its faith. *Id.* It is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Agency for Int'l Dev. v. AOSI*, 133 S. Ct. 2321, 2327 (2013) (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 61 (2006)). The government cannot "mandat[e] speech that a speaker would not otherwise make," *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006) (quoting *Riley,* 487 U.S. at 795). The government

especially cannot "force[] an individual . . . to be an instrument for fostering public adherence to an ideological point of view" that is "repugnant to [her] moral [and] religious . . . beliefs." *Wooley v. Maynard*, 430 U.S. 705, 707-08, 715 (1977); *see also DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) ("The government cannot require an individual to become an instrument for fostering public adherence to an ideological point of view he finds unacceptable."). Further, courts allow only regulations that determine what affected parties "must *do* . . . not what they may or may not *say.*" *FAIR*, 547 U.S. at 60 (emphases in original). Here, forced speech *is* the essential act required. Such "direct regulation of speech . . . plainly violate[s] the First Amendment." *AOSI*, 133 S. Ct. at 2327.

It is irrelevant that Wheaton can tell its students, employees, and supporters that the words the government forces them to utter are "words without belief" or are a "gesture barren of meaning." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). In *Wooley*, it was no answer that "plaintiffs could have 'place[d] on their bumper a conspicuous bumper sticker explaining in no uncertain terms that they do not profess [the state message they were forced to speak] and that they violently disagree with the connotations of that'" message. *Frudden v. Pilling*, 742 F.3d 1199, 1205 (9th Cir. 2014) (quoting *Wooley*, 430 U.S. at 722 (Rehnquist, J., dissenting)).

Government may not force citizens to speak out of both sides of their mouths. *AOSI*, 133 S. Ct. at 2331 (grantees could express contrary beliefs "only at the price of evident hypocrisy"). Yet that is what the Mandate demands. The government bears the burden of demonstrating why it may penalize Wheaton for declining to speak through EBSA Form 700. *See United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

15

Wheaton has no way to avoid these coercive requirements. Foregoing the original mandate and refusing to sign EBSA Form 700 would subject it to the original Mandate, meaning Wheaton would be forced by the government to pay directly for abortifacient products, and for related "patient education and counseling for all women with reproductive capacity." HRSA Guidelines, Ex. B-2. Such a course would violate Wheaton's religious liberty, and forcing it to pay for speech counseling and educate people about how to use abortion-inducing products would separately violate Wheaton's speech rights. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977) (finding that forced contributions for union political speech violate the First Amendment "notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State"); *United States v. United Foods Inc.*, 533 U.S. 405, 411 (2001) (finding that forced contributions for advertising related to unbranded mushrooms violates First Amendment); *Entm't Software Ass'n*, 469 F.3d at 653 (finding that forced labeling on video games violates the Free Speech Clause). Compelled speech was not addressed in *Notre Dame*. *See* 743 F.3d at 560-61. This attempt to compel Wheaton's speech fails strict scrutiny under *Korte v. Sebelius*, 735 F.3d 654, 685-687 (7th Cir. 2013), which struck down the Mandate as applied against for-profit corporations. *See infra* Part I(D)(3).

### 2. The Mandate compels Wheaton to be silent on specific topics to specific audiences.

"Most speech or writing intended to influence someone's decision—to persuade someone to do or not do something—*is* protected." *Notre Dame*, 743 F.3d at 560. Yet under 26 C.F.R. § 54.9815-2713A(b)(iii), Wheaton "must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements." This is known as the "gag rule." The Seventh Circuit found itself "troubled by the seeming vagueness" of this rule and afraid "that it

may have pernicious consequences if understood to forbid or inhibit" free discussions between Notre Dame and its contraceptives providers over which kinds of contraceptives to provide. *Notre Dame*, 743 F.3d at 560-61. Yet it declined to rule on this issue in part because Notre Dame failed to tell "us what it wants to say but fears to say," and in part because "the government hasn't clearly embraced an interpretation of the regulation that would give rise to the concerns we've expressed." *Id.* at 561. Here, by contrast, the claims by both Wheaton and the government are clear, as is Wheaton's entitlement to relief.

*Wheaton's Speech.* Wheaton does not wish to "express[] its opposition to the use of contraceptives" generally, but to request that its TPAs not use its plans to provide emergency contraceptives. *Cf. Notre Dame*, 743 F.3d at 561; *see* Ryken Decl. ¶ 43, 48. Wheaton's concern about these products is religiously-grounded, but it has a health dimension as well: Wheaton objects to them because they pose significant health risks to developing human embryos. Ryken Decl. ¶ 42. As a religious institution committed to the sanctity of human life, Wheaton feels itself bound to speak in favor of measures that protect those lives—most specifically to the TPAs responsible for providing contraceptive products to Wheaton's employees. Ryken Decl. ¶ 18. That is *precisely* the kind of speech the Seventh Circuit found it problematic to exclude under the gag rule. *Notre Dame*, 743 F.3d at 561 ("The example we gave was not of a statement of opposition to the use of contraceptives, but of a statement intended to influence the choice of contraceptives that the third-party administrator or the health insurance provider would cover.").

*The Government's Interpretation of the Gag Rule.* Although the government's motion tries to sidestep the issue by stating that Wheaton "remains free to express whatever views it may have" without saying *to whom* (Gov't Br. 31), in other cases counsel for the government has conceded that the gag rule means that accommodated entities like Wheaton cannot say anything "that would

cause the TPA to . . . forgo providing this coverage," and in particular cannot say "something like, Don't do this or we're going to fire you."[14] Thus, as another Mandate case held, the gag rule "imposes a content-based limit on [Wheaton] that directly burdens, chills, and inhibits [its] free speech."[15] *Roman Catholic Archbishop of Wash. v. Sebelius*, No. 13-1441, 2013 WL 6729515, at *37 (D.D.C. Dec. 20, 2013); *see also Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000) ("[S]ingl[ing] out certain viewpoints or subject matter for differential treatment" is forbidden viewpoint discrimination).

Nor does it matter that Wheaton may tell everyone *but* its TPA that it does not want the TPA to provide the coverage. A ban on "speech tailored to a particular audience . . . cannot be cured simply by the fact that a speaker can speak to a larger indiscriminate audience." *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1232 (10th Cir. 1999). "Effective speech has . . . a speaker and an audience. A restriction on either . . . is a restriction on speech." *Id.*; *accord Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1182 (11th Cir. 2009) (generally, "government may not . . . prevent[] [a] speaker[']s access to [its] audience").

Each violation—compelled speech and compelled silence—triggers strict scrutiny, *TBS, Inc. v. FCC*, 512 U.S. 622, 642 (1994), which the Mandate fails under *Korte* and for the reasons discussed below.

---

[14] Ex. B-7 (Hr'g Trans. 112:14-17, 112:23-113:1, *Reaching Souls Int'l v. Sebelius*, No. 1:13-cv-1092 (W.D. Okla. Dec. 16, 2013) (statements from Benjamin Berwick, counsel for the government).

[15] It is no answer to say—as Judge Posner suggested, in *dicta*—that by asking its TPA not to provide emergency contraceptives, Wheaton would be "urging civil disobedience." *Notre Dame*, 743 F.3d at 561. Under the government's regulations, the TPA may choose between providing emergency contraceptives and walking away from its contract with Wheaton. 78 Fed. Reg. at 39880. That is precisely why (a) the government does not want Wheaton to talk with the TPA about its decision to provide emergency contraceptives, and (b) Wheaton wants to talk with the TPA about that very subject. Where federal law has given a party a lawful choice, it surely must be permissible for free people to discuss that choice. Where the government forbids such discussion (from one side of the debate—there is no similar prohibition on third parties or the government encouraging the TPA to provide the coverage) it has enacted an obviously viewpoint-based speech restriction. *See Schultz*, 228 F.3d at 840.

### D. The Mandate violates the Religious Freedom Restoration Act.

Under RFRA, the federal government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). RFRA thus "restore[s]" strict scrutiny to religious exercise claims, as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). 42 U.S.C. § 2000bb-1(b)(1); *see also Gonzales v. O Centro*, 546 U.S. 418, 424, 431 (2006).

A plaintiff states a claim under RFRA by showing the government substantially burdens its sincere religious exercise. *O Centro*, 546 U.S. at 428. The burden then shifts to the government to "demonstrat[e] that applying the contraception mandate is the least restrictive means of furthering a compelling governmental interest." *Korte*, 735 F.3d at 685 (internal quotation omitted). The government has already failed the strict scrutiny portion of this test. *Korte*, 735 F.3d at 685-687.

*Notre Dame* acknowledged that its analysis of RFRA was "tentative," and based only on the evidentiary record before it. 743 F.3d at 551-52. Wheaton's case is factually distinguishable because here, there is a clear act that Wheaton has not yet taken that the government is forcing it to take in violation of its beliefs: signing and delivering EBSA Form 700 to its TPA and insurance provider. It is also distinguishable because Wheaton's contracts with its TPA, which expressly disclaim any fiduciary duties on the part of the TPA, will be materially altered if Wheaton signs and delivers EBSA Form 700. And finally, it is distinguishable because the government's only asserted reason for limiting its exemption to "houses of worship" and their "integrated auxiliaries"—that they are more likely to employ fellow believers who share their religious objections—does not apply at all to Wheaton College, which only employs people who share its religious beliefs about the sanctity of human life.

19

### 1. Wheaton's abstention from facilitating access to abortifacient products is sincere religious exercise.

RFRA broadly defines "religious exercise" to "include[ ] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4), *as amended by* 42 U.S.C. § 2000cc-5(7)(A).

The Mandate requires Wheaton, contrary to its sincere beliefs, to actively participate in a scheme to facilitate and encourage the use of abortifacients. Ryken Decl. ¶ 44. Wheaton cannot execute the self-certification form the government has provided without making itself morally complicit in the government's scheme, which would violate Wheaton's religious beliefs.

Abstaining for religious reasons from practices believed to be immoral easily qualifies as "religious exercise," just as much as refusing to manufacture items that will later be used in warfare, *see Thomas v. Review Bd.*, 450 U.S. 707 (1981), abstaining from work on certain days, *see Sherbert*, 374 U.S. 398, or providing alternative education for children, *see Yoder*, 406 U.S. 205; *see also Korte*, 735 F.3d at 683 (participating in the mandate "would make [plaintiffs] complicit in a grave moral wrong and would undermine their ability to give witness to the moral teachings of their church").

### 2. The Mandate imposes a substantial burden of enormous fines on Wheaton's religious exercise of abstention.

This Circuit has binding caselaw explaining how to determine whether a government action imposes a "substantial burden" under RFRA. A government action substantially burdens a religious belief when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" *Korte*, 735 F.3d at 682 (quoting *Thomas,* 450 U.S. at 718)). The analysis of a

substantial burden "focuses primarily on the '*intensity of the coercion* applied by the government to act contrary to religious beliefs.'"[16] *Id.* at 683 (citation omitted, emphasis in original).

The Mandate easily qualifies as a substantial burden under this test. Before the Mandate, Wheaton was free to contract with its insurers and TPAs to obtain conscience-compliant health plans that excluded abortion-causing contraceptives. Fully-exempt religious employers remain free to purchase such plans today, and employers with grandfathered plans that reflect their conscience may keep those plans indefinitely. But on July 1, 2014, Wheaton will lose its right to tailor its insurance offerings to its religious beliefs. This is a burden on Wheaton's religious

---

[16] *Amicus* ACLU goes a step further and argues—based largely on out-of-circuit and pre-RFRA cases— that allowing Wheaton's narrow claim in this case would open the door to all manner of racist and sexist claims cloaked in religious garb. *Amicus* Br. at 6-9 (citing pre-RFRA cases from the Supreme Court and the Fourth, Fifth, and Ninth Circuits and one HHS Mandate decision from a district court in the Eighth Circuit). Setting aside for the moment the great irony of comparing abolitionist-founded Wheaton College with racist restaurants in the Jim Crow south, *amicus*' concerns have no basis in reality. In most of the cases cited by *amicus*, these claims *lost*—indicating that courts have no trouble distinguishing between meritorious and unmeritorious religious freedom claims. Here, by contrast, injunctions have issued in twenty out of twenty-one similar cases.

*Amicus* also asserts that RFRA is somehow inapplicable to Wheaton's claims because "Congress did not contemplate that RFRA would be used to deny other people their rights or benefits." ACLU *Amicus* Br. at 6. But nearly every civil rights accommodation imposes some kind of burden on third parties—to take one of *amicus*' favored examples, opening veterans' cemeteries for religiously-required weekend burials plainly burdens the civil servants who run the cemeteries and who may have contractual rights not to work on weekends.

In any event, *amicus*' account of RFRA's legislative history is unduly selective. In addition to veterans' cemeteries, Congress also heard testimony about the plight of St. Agnes Hospital, a Roman Catholic teaching hospital in Baltimore that objected to providing its residents with clinical training in sterilization, abortion, or artificial contraception. *Religious Freedom Restoration Act of 1991: Hearings before the Subcomm. on Civil & Constitutional Rights of the H. Comm. On Judiciary*, 102d Cong. 340 (1993) (statement of Prof. Douglas Laycock, University of Texas, discussing *St. Agnes Hospital of the City of Baltimore, Inc. v. Riddick*, 748 F. Supp. 319 (D. Md. 1990)).

A religious exemption for St. Agnes would plainly affect both residents and patients, but St. Agnes would not, for this reason, be precluded from bringing a claim under RFRA. Instead, these third-party burdens would be properly weighed as part of the "compelling interest" analysis that RFRA requires. 42 U.S.C. § 2000bb-1(b)(1). Indeed, the fact that the effects on third parties are already part of the statutory analysis played a key role in the Supreme Court's unanimous decision upholding the constitutionality of RFRA's sister statute, RLUIPA. *Cutter v. Wilkinson*, 544 US 709, 720 (2005) (Ginsburg, J.) ("Properly applying RLUIPA, courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.").

exercise as surely as a ban on kosher slaughter would be a burden on the religious exercise of an observant Jew.[17] *See also Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 849 (7th Cir. 2000) (allowing Indiana wine consumers to challenge a state law banning wine shipments by out-of-state wineries without a license); *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) (allowing city residents who owned guns to challenge a ban on firing ranges within city limits).

The Mandate is a substantial burden in another way as well. The Mandate directly coerces Wheaton to "act contrary to [its] religious beliefs" by facilitating a scheme it believes is immoral. *Korte*, 735 F.3d at 683. By paying for insurance and designating an outside party through signing EBSA Form 700, Wheaton would facilitate use of emergency contraceptives in violation of its sincere beliefs. Ryken Decl. ¶ 63.

With respect to Wheaton's self-funded prescription drug plans, the burden is particularly severe. Presently, Wheaton's contract with its TPA is carefully crafted to avoid making the TPA into a plan administrator with fiduciary duties under ERISA. Under its existing agreement, Wheaton's TPA is merely a "claims administrator" whose responsibilities are limited to "rendering advice . . . and administering claims" and who is "not a fiduciary with respect to" Wheaton's self-funded plan.[18]

---

[17]  As General Verrilli acknowledged during oral argument in *Sebelius v. Hobby Lobby*, if a state enacted an animal-rights law that effectively banned kosher or halal slaughter, "in that circumstance, you would have . . . an ability for customers to bring suit." Oral Arg. Trans. 79:14-16, *Sebelius v. Hobby Lobby*, No. 13-354 (U.S. argued March 25, 2014).

[18]  The current contract between Wheaton and its TPA (the "Claim Administrator") states this expressly:

> The **Claim Administrator's responsibilities hereunder are intended to be limited to those of a contract claims administrator rendering advice to and administering claims** on behalf of the plan administrator of the Employer's plan. As such, **the Claim Administrator is intended to be a service provider but not a fiduciary** with respect to the Employer's ERISA employee welfare benefit plan. The Employer represents that its ERISA employee welfare benefit plan contains the plan procedure described above regarding the designation of responsibilities under a plan and, accordingly, the Claim Administrator may, pursuant to Sections 402(c)(2) and 405(c)(1)(B) of ERISA, render advice with respect to claims and administer claims on behalf of the plan administrator of

Signing and delivering EBSA Form 700 materially alters this relationship. EBSA Form 700 "constitutes notice" that Wheaton "[w]ill not act as the plan administrator or claims administrator," directs the TPA to the regulations that require it to provide the objected-to drugs and devices itself, and states that it is "an instrument under which the plan is operated." 78 Fed. Reg. at 39880. When creating the accommodation, the government stated that TPAs that receive EBSA Form 700 and agree to remain in a "contractual relationship" with a religious institution "must . . . take on the statutory responsibilities of a plan administrator under ERISA," and that EBSA Form 700 itself "will be treated as a designation of the [TPA] as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." *Id.* at 39879.

All this means that, as Defendants admitted in a parallel case, a TPA's "duty" to "become a plan administrator" and provide the mandated coverage "only arises . . . *by virtue of the fact that they receive the self-certification form from the employer*."[19] And, according to the government, "if [Wheaton] completed [EBSA Form 700] and provide[d] it to [Wheaton's] TPA, the[] TPA would then be required to" provide the objectionable coverage. *Id.* at 11:3-6.

Since Wheaton can continue to exercise its faith only by dropping coverage and/or facing enormous penalties, 26 U.S.C. § 4980D; 29 U.S.C. § 1132(a), the Mandate most certainly places "intens[e] . . . coercion" on Wheaton to "modify [its] behavior and to violate [its] beliefs." *Korte*, 735 F.3d at 682, 683.

---

the Employer's ERISA welfare benefit plan. **The Claim Administrator has no other authority or responsibility with respect to Employer's ERISA employee welfare benefit plan**.

Ryken Decl. Ex. A-3 (Administrative Services Agreement at 15) (emphasis added).

[19] Ex. B-8 (Hr'g Trans. 13:19-22, *Roman Catholic Archbishop of Washington v. Sebelius*, No. 1:13-cv-1441 (D.D.C. Nov. 22, 2013)) (statement of counsel for the government Jacek Pruski).

### 3. The Mandate cannot survive strict scrutiny.

The government admits that *Korte* rejected its strict scrutiny arguments, and that this Court is bound by that decision. Gov't Br. 18. As we explain below, *Korte* was correct to reject the government's arguments in that case, and the government has failed to do any more to carry its burden in this case.

### a. The government has identified no compelling interest.

Strict scrutiny requires "the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430-31; *Korte*, 735 F.3d at 685 ("[U]nder RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening *these* claimants."). It cannot do so here.

The government's own actions undermine the interests it asserts. Here and in *Korte,* the government has asserted two compelling interests: "public health" and "gender equality." Gov't Br. at 19-20; *Korte*, 735 F.3d at 686. As a threshold matter, the Seventh Circuit has already held that "[b]y stating the public interests so generally, the government guarantees that the mandate will flunk the test." *Id.* And the ways that the government's own actions undermine its asserted interests are obvious. Forcing a conflict between Wheaton's religious beliefs and the Mandate may coerce Wheaton into dropping employee health insurance altogether. If that happened, the government's intransigent policy would result in *fewer* people having *any* insurance coverage—whereas presently Wheaton employees enjoy generous health benefits that cover all mandated preventive services *except* emergency contraceptives. How this disastrous outcome would advance the government's claimed purpose of expanding contraceptive coverage is anybody's guess.

24

With respect to gender equality, the government's case is equally weak. Prior to the ACA, no federal court of appeals had ever held that failure to cover contraceptives was gender discrimination. Quite the opposite: the only circuit to reach the issue held that a health plan that did not cover any contraceptives was fully compliant with both the Pregnancy Discrimination Act and Title VII. *In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 945 (8th Cir. 2007). The government also does not explain how granting an exemption to Wheaton, which has no objection to non-emergency contraceptives, undermines the government's asserted interest in gender equality any more than the government's own exemptions, which extend to health plans covering "tens of millions of people," and which allow exempted employers to offer *no* contraceptive coverage. [20] *Hobby Lobby v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013), *cert granted* 134 S.Ct. 678 (2013).

"[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal quotation omitted); *accord Hobby Lobby*, 723 F.3d at 1143. Here, the "exempted population includes those working for private employers with grandfathered plans, [and] for employers with fewer than fifty employees." *Id*. In addition, some religious organizations are exempt from the Mandate altogether. *See* 45 C.F.R. § 147.131 (religious exemptions); 26 U.S.C. § 5000A(d)(2)(A) & (B) (exempting "health care sharing ministr[ies]" and other religious organizations). These massive exemptions cover upwards

---

[20] *Amicus'* gender equality argument is even weaker: it asserts that the Court should be particularly skeptical of Wheaton's claims because "in times of social change," "entities and individuals invoked religious freedom to try to avoid compliance with laws designed to advance equality." ACLU *Amicus* Br. at 7-8. But this is hardly a "time of social change" with respect to contraceptives, whose use has been constitutionally protected since 1965 and which, by *amicus'* own account, are used by "99% of women . . . at some point in their lifetime." *Griswold v. Connecticut*, 381 U.S. 479 (1965); ACLU *Amicus* Br. at 9.

of 80 million people.[21] That means that—as every court of appeals to reach the question has held—the Mandate fails strict scrutiny.

The government gamely asserts that these massive exemptions do not "undermine" its compelling interests, in part because "there is a rational distinction between the narrow religious employer exemption . . . and the expansion of that exemption that [Wheaton] seeks"—specifically, that "[h]ouses of worship" are "more likely than other employers to employ people of the same faith." Gov't Br. 22. Even if the government's assumption were true as a general matter,[22] it is clearly false with respect to Wheaton. As the CCCU informed the government during its rulemaking, and as Wheaton has told the government in two successive lawsuits, Wheaton employs members of its own faith who agree with Wheaton's views on the sanctity of human life. Ex. B-6; Complaint ¶¶ 27-29, *Wheaton v. Sebelius*, No. 1:12-cv-01169 (D.D.C. July 18, 2012) (*Wheaton I*); Doc. 1, Compl. ¶ 28-30. The government's bureaucratic response—that its narrow religious employer exemption is justified as a general matter—hardly complies with RFRA's command to "establish a compelling and specific justification for burdening *these* claimants." *Korte*, 735 F.3d at 685.[23] The government has pointed to no authority, and we are aware of none, which authorizes it to exempt itself from RFRA by carving out a religious accommodation that is smaller than the law requires.

---

[21] The government expected 55% of the 133 million people covered by large employer health plans to be on grandfathered plans as of 2013. *See* Ex. B-9. And "small employers," employing nearly 34 million people, need not offer health insurance at all and can therefore avoid the Mandate. Ex. B-10.

[22] *Cf.* Ex. B-5 (Doc. 51-1, Cohen Dep. Trans. at 34:9-24, *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 1:13-cv-00303 (E.D.N.Y. Nov. 12, 2013) (admission by the government's Rule 30(b)(6) witness that the government's assumption was not based on any evidence).

[23] "The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability." *O Centro*, 546 U.S. at 436.

### b. The government has numerous less restrictive means of furthering its interests.

Even assuming that HHS had identified a compelling interest and that the Mandate advanced it, the Mandate still fails strict scrutiny because there are other readily-available means of expanding contraception coverage far less restrictive of Wheaton's rights. *Playboy Entm't Group, Inc.*, 529 U.S. at 813 ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.").

In scores of lawsuits provoked by the Mandate, HHS "has not even tried to satisfy the least-restrictive-means component of strict scrutiny, perhaps because it is nearly impossible to do so here." *Korte*, 735 F.3d at 686; *accord Grote v. Sebelius*, 708 F.3d 850, 855 (7th Cir. 2013) (HHS "has not demonstrated that requiring religious objectors to provide cost-free contraception coverage is the least restrictive means of increasing access to contraception"). This flows in part from its extremely broad statement of the government interest, which "makes it impossible to show that the mandate is the least restrictive means of furthering" the interests. *Korte*, 735 F.3d at 686.

Indeed, HHS has "many ways" to further its interests, "almost all of them less burdensome on religious liberty." *Id.* For example, the government could:

- Directly provide or subsidize the drugs at issue through pre-existing government family-planning programs.
- Directly provide insurance coverage for the drugs at issue through the state and federal health exchanges.
- Provide a tax credit to employees who purchase contraceptives with their own funds.
- Empower willing actors—for instance, physicians, pharmaceutical companies, or various interest groups—to deliver the drugs and sponsor education about them.
- Use their own resources to inform the public that these drugs are available in a wide array of publicly-funded venues.

This array of alternatives is real. *Korte*, 735 F.3d at 686 (listing several similar options); *see also, e.g., Archdiocese of N.Y.*, 2013 WL 6579764, at *18 (noting similar alternative means "have been recognized as feasible alternatives by other courts") (citing *Korte*).

Several of these alternatives exist today. For example, section 330(a) of the Public Health Service Act authorizes grants to thousands of health center sites in medically underserved areas throughout the United States, and grantees are required by law to cover "voluntary family planning services." 42 U.S.C. § 254b(b)(1)(A)(i)(III)(gg). The ACA authorized $11 billion in funding for these centers,[24] and there are fifteen health centers in Wheaton College's home county of DuPage, including two in the town of Wheaton itself.[25] In addition, HHS planned to spend nearly $300 million in 2013 to provide contraceptives directly through Title X funding.[26] In short, the federal government, in partnership with state governments, has constructed an extensive funding network designed to increase contraceptive access, education, and use, including:

- $2.37 billion for family planning in FY 2010.
- $228 million in FY 2010 for Title X program.
- $294 million in state spending for family planning in FY 2010.[27]

The government can employ such pre-existing sources to increase contraceptive access. *Riley*, 487 U.S. at 800 (striking down a law due to existing alternative means of accomplishing the state's interests without harming First Amendment rights, concluding that "precision of regulation must be the touchstone in an area so closely touching our most precious freedoms").

---

[24] Ex. B-11 (HRSA, The Affordable Care Act and Health Centers 2, http://bphc.hrsa.gov/about/healthcenterfactsheet.pdf (last visited Apr. 22, 2014)).

[25] HRSA, Find A Health Center, findahealthcenter.hrsa.gov (search for "Wheaton, IL" yields information on DuPage PADS (Access), 705 W Liberty Dr, Wheaton, IL 60187-4842 and VNA at DuPage Health Department, 111 N County Farm Rd, Wheaton, IL 60187-3977, as well as three additional centers within five miles).

[26] *See* Ex. B-12 (HHS, Announcement of Anticipated Availability of Funds for Family Planning Services Grants (FY 2013) at 9-10, http://www.hhs.gov/opa/pdfs/fy-13-services-announcement.pdf).

[27] Ex. B-13 (Guttmacher Inst., *Facts on Publicly Funded Contraceptive Services in the United States* (March 2014), http://www.guttmacher.org/pubs/fb_contraceptive_serv.html (citations omitted).

It is no answer to say, as the government does here, that these numerous less-restrictive alternatives are not "equally effective" because they do not rely on "the existing employer-based system of health coverage" and entail additional "logistical and administrative obstacles to receiving coverage." Gov't Br. 23. As a threshold matter, the government *itself* has imposed such "obstacles" on the millions of people enrolled in grandfathered plans and plans already subject to the religious employer exemption. More to the point, the government has asserted compelling interests in public health and gender equality, not strengthening the "existing employer-based system of health coverage." It cannot rely on an interest it has never asserted as compelling to reject less-restrictive alternatives it appears perfectly happy to rely on outside of this case.

Nor is the government entitled to reject these alternatives because "the agencies lack statutory authority to implement [them]." Gov't Br. 24. When evaluating less restrictive alternatives, the Supreme Court routinely relies on proposals that would require a change in the law. *Riley*, 487 U.S. at 800 (identifying the following less restrictive alternatives to state's overbroad fundraising disclosure law: (1) creating a new publication program, and (2) expanding the enforcement of existing antifraud laws); *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1458-60 (2014) (suggesting less restrictive alternatives that would require Congress to change existing law or agencies to change existing regulations). If the government were entitled to reject less-restrictive alternatives merely because they are different from the statutory scheme Congress enacted, the strict scrutiny test would lose all meaning.

For the reasons stated above, Wheaton is entitled to summary judgment on its Free Exercise, Establishment, and Free Speech claims, its APA claims, and its claims under RFRA.

## II.    The remainder of the claims in the government's motion to dismiss and for summary judgment should be denied.

The government has moved for dismissal or summary judgment on the remainder of Wheaton's claims. For the reasons stated below, this motion should be denied.

### A.  The Mandate violates Wheaton's Free Exercise rights.

Defendants claim that the Mandate does not violate the Free Exercise Clause because it is "neutral and generally applicable." Gov't Br. 25. It is neither.

The Mandate is not neutral because it expressly discriminates among religious objectors, creating a three-tiered system in which some are exempt (churches and "integrated auxiliaries"), some must comply with the "accommodation" and gag rule at issue here (non-exempt religious non-profits), and some receive no protection at all (religious believers who earn profits).

This open discrimination among religious institutions fails even "the minimum requirement of neutrality" which requires that a law *not* discriminate on its face. *Lukumi*, 508 U.S. at 533; *Hinrichs*, 506 F.3d at 588 ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").[28]

Nor is the Mandate generally applicable. The Mandate favors secular over religious values by granting broad secular exemptions for grandfathered and small-employer plans, while denying religious exemptions for non-church religious organizations. *Bloch v. Frischholz*, 587 F.3d 771, 785-86 (7th Cir. 2009) (noting that "the First Amendment prohibited 'laws which, though neutral

---

[28]  Defendants cite *Lukumi* to argue that the Free Exercise Clause is not invoked because the Mandate does not target *only* religious conduct. *See* Gov't Br. 26 & n.17. But this oversimplification would excuse all but the most blatant attacks on religion. *Lukumi* warned against this reading, noting that the "explicit[ ] target[ing]" made it "an easy [case]" and "that the First Amendment's protection of religion extends beyond those rare occasions on which the government explicitly targets religion (or a particular religion)." *Lukumi*, 508 U.S. at 577-78, 580 (Blackmun, J., concurring); *see also id.* at 564 (Souter, J., concurring) ("[T]his is far from a representative free-exercise case."); *Weaver*, 534 F.3d at 1259-60 ("[T]he constitutional requirement is of government *neutrality,* through the application of 'generally applicable law[s],' not just of governmental avoidance of bigotry.").

in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment"); *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (government cannot decide "that secular motivations are more important than religious motivations."). These broad secular-value exemptions severely undermine the government's claimed interest. *See supra* Section I(D)(3)(a); *Korte*, 735 F.3d at 686 ("a law cannot be regarded as protecting an interest of the highest order ... when it leaves appreciable damage to that supposedly vital interest unprohibited.") (*Lukumi,* 508 U.S. at 547); *see also Zubik*, 2013 WL 6118696, at *29 ("If there is no compelling governmental interest to apply the contraceptive mandate to . . . 'houses of worship,' then there can be no compelling governmental interest to apply (even in an indirect fashion) the contraceptive mandate to . . . nonprofit, religious affiliated/related entities"). Defendants nowhere explain *why* they can accept secular reasons for exempting millions, but refuse the modest religious exemption sought here.

Further, the "religious employer" exemption is wholly discretionary. 45 C.F.R. § 147.131(a) (agency "may" establish exemption). Defendants have already revised the exemption once, simply in response to public comment, 78 Fed. Reg. 39873-74, and—underscoring its discretionary nature—enacted the exemption only via footnote on an HHS website. *See* Ex. B-2, HRSA Guidelines. And it favors secular motivations for grandfathered and small-employer exemptions, while eschewing exemptions for non-church religious organizations. *Cf. Fraternal Order*, 170 F.3d at 365. Adding discriminatory exemptions to the law emphasizes, not ameliorates, their invidiousness. *Lukumi*, 508 U.S. at 542 ("categories of selection are of paramount concern"); *Fraternal Order*, 170 F.3d at 365 (the "concern is only further implicated when the government

does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption").[29]

## B. The Mandate violates Wheaton's right to expressive association.

Defendants make a one-paragraph argument against Wheaton's expressive association claim, arguing that the right is only infringed via forced acceptance of unwanted members. Gov't Br. 32-33. But unconstitutional burdens on expressive association "take many forms," just "one of which" is a "regulation that forces the group to accept members it does not desire." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The appropriate inquiry is whether an association is expressive and, if so, whether the challenged law "impair[s] [Wheaton's] expression." *Id.* at 648, 653. Courts must "give deference to" Wheaton's views on both. *Id.* at 653.

Wheaton "aspires to live, work, serve, and worship together as an educational community centered around the Lord Jesus Christ." Ryken Decl. ¶ 11. This commitment is reflected in Wheaton's course offerings, which are intended to promote the development of whole and effective Christians who will impact the church and society worldwide "[f]or Christ and His Kingdom." *Id*. at ¶ 12. To further this mission, Wheaton has adopted a set of institutional standards, known as the Community Covenant, designed to "foster the kind of campus atmosphere most conductive to becoming the Christian community of living, learning, and serving Wheaton College aspires to be." *Id.* at ¶¶ 13-14. Each year, all Wheaton College students and employees voluntarily

---

[29] Defendants' claim that "every court" to consider a free exercise challenge "has rejected it," Gov't Br. 25, 31, is misleading. The vast majority of courts have held the Mandate unlawful under RFRA and so have not reached the Free Exercise claim. Defendants make similarly misleading statements about other non-RFRA claims.

All such claims should be viewed in their proper light. Other than the *Notre Dame* case, *every single non-profit Mandate case in the nation has resulted in an injunction against the Mandate*. And the government itself told the Seventh Circuit that *Notre Dame* was different from other cases precisely because Notre Dame had executed the form. *See Notre Dame*, 743 F.3d at 554 (discussing form).

commit themselves to this community by signing Wheaton College's Community Covenant. *Id.* at ¶ 14. In addition to signing the Community Covenant, Wheaton's Board of Trustees, faculty, and staff annually reaffirm the College's doctrinal statement. *Id.* at ¶ 15.

The Mandate impairs this expressive association by introducing a required term—coverage for abortion-causing contraceptives, both for employees and students—into the relationship. That required term conflicts with Wheaton's witness and would damage its association with its students and employees. *Id.* at ¶ 21. Indeed, once Wheaton has signed the form, the insurer or TPA must send notice to Wheaton's employees and students explicitly informing them that emergency contraceptives are available to them. 45 C.F.R. § 147.131(d). This impermissibly "intru[des] into the internal structure or affairs of" Wheaton's association with its employees. *Dale*, 530 U.S. at 648.

### C. The Mandate unconstitutionally discriminates.

As shown above, the Mandate's discrimination against Wheaton violates the Establishment Clause. Such discrimination also violates the Fifth Amendment, once again subjecting the Mandate's religious classifications to strict scrutiny. *See, e.g.*, *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 534-35 (7th Cir. 2009) (noting that a claim of government discrimination on the basis of religion "can always be attacked as a violation of the equal protection clause"). But the classifications cannot survive even rational basis review: Defendants' discrimination among essentially identical religious organizations based on unfounded speculation about their employees' beliefs is flatly illegal. *Weaver*, 534 F.3d at 1259 (banning "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations"). Thus, summary judgment is inappropriate on Counts VII and VIII.

Related facts also establish that Defendants are not entitled to summary judgment on Wheaton's "unbridled discretion" claim (Count XI). Creation of the discriminatory "religious employer" exemption in a website footnote, revised at agency whim, and extended only to institutional churches, is a perfect example of unbridled discretion. *See*, *e.g.*, Ex. B-2 HRSA Guidelines. Determining who may exercise First Amendment rights may not be left to the "unbridled discretion" of a government official, "because excessive discretion can lead to discriminatory enforcement." *Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014).

### D.     The Mandate violates the Administrative Procedure Act.

#### 1.    Defendants failed to follow notice-and-comment procedures.

Defendants misunderstand Wheaton's APA claims. Gov't Br. 34. Wheaton alleges that Defendants failed to follow the APA's notice and comment requirements when they promulgated the *HRSA guidelines*, which are the source for the requirement that Wheaton cover "all FDA-approved contraceptives" in its health plans.

Congress gave HRSA the authority to enact "comprehensive guidelines" for women's preventive health. *See* 42 U.S.C. § 300gg-13(a)(4). This is a quintessential delegation of rulemaking authority, for which notice and comment rulemaking is "mandatory." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 169 (7th Cir. 1996) ("a rule promulgated pursuant to such a [Congressional] delegation" is "the clearest possible example of a legislative rule, as to which the notice and comment procedure . . . is mandatory.").

But instead of following the requirements of notice-and-comment rulemaking, 5 U.S.C. § 553, HRSA adopted the recommendations of a nongovernmental body—IOM—on HRSA's website. Ex. B-2, HRSA Guidelines. Defendants claim that "IOM determined that coverage, without cost-

sharing, for these services is necessary[.]" Gov't Br. 5. This is false: HRSA never asked the IOM to make recommendations about "coverage decisions," which IOM noted "often consider a host of other issues, such as . . . ethical, legal, and social issues; and availability of alternatives." IOM Report at AR 304-05; *id.* at 300 (HRSA charge). HRSA nonetheless incorporated the IOM guidelines without change in a fully binding Interim Final Rule promulgated *the same day*. 76 Fed. Reg. 46621 (Aug. 3, 2011); 45 C.F.R. § 147.130. Those guidelines exist on a website, and have never been published in the Federal Register, but are nonetheless binding on Wheaton. Ex. B-2, HRSA Guidelines. This violates the APA.

That the government later submitted its rules regarding the *exemption* to the HRSA guidelines to notice and comment is beside the point. Gov't Br. 34. There has never been an opportunity to comment on the guidelines themselves—which are the source of the requirement to cover all FDA-approved contraceptives. Among other things, Wheaton was prejudiced by the lack of opportunity to comment on the guidelines' requirement that employers provide "all FDA-approved contraceptives" instead of simply a subset. The opportunity to comment on related rules at a later time did not cure this defect. "[P]arties ought to have a meaningful opportunity to present these materials to the agency *before* it embarks upon a course of action, particularly if the agency can impose criminal or civil sanctions for violations of its regulations." *Nw. Tissue Ctr. v. Shalala*, 1 F.3d 522, 530-31 (7th Cir. 1993) (emphasis added); *see also Hoctor*, 82 F.3d at 171 ("The greater the public interest in a rule, the greater reason to allow the public to participate in its formation."). Because the guidelines were not properly promulgated, they are invalid. *Id.* at 172 (holding that a rule that is "not promulgated in accordance with the required procedure" is "invalid.").

### 2. The Mandate is arbitrary and capricious.

Agency action is arbitrary and capricious where it "entirely fail[s] to consider an important aspect of [a] problem [or] offer[s] an explanation for its decision that runs counter to the evidence." *Motor Vehicle*, 463 U.S. at 43. We have already explained the ways in which the Mandate is arbitrary and capricious because Defendants' explanation for limiting the religious employer exemption "runs counter to the evidence" that was before them and, indeed, was not based on any evidence at all. Defendants claim that it was acceptable to exempt certain religious groups, but not Wheaton, because those groups "are more likely than other employers to employ people of the same faith who share the same objection. . . ." 78 Fed. Reg. at 39874. That claim is unsupported. *See supra* Section I(A). It is also arbitrary and capricious because defendants "failed to consider an important aspect of the problem." Secretary Sebelius discussed the content of the Final Rule the same day that the comment period closed, without taking the time to review—let alone consider—the over 400,000 comments submitted on the NPRM. *See* Wheaton's Statement of Additional Facts ¶ 36.

### 3. The Mandate violates governing law.

The Mandate violates the APA because it violates the ACA, 42 U.S.C. § 18023(b)(1)(A), and the Weldon Amendment. The ACA forbids "requir[ing] a qualified health plan to provide coverage of [abortion services]," 42 U.S.C. § 18023(b)(1)(A)(i), and the Weldon Amendment prohibits federal agencies from discriminating against "health insurance plan[s]" because the plan "does not provide, pay for, provide coverage of, or refer for abortions."[30] Since there is no definition for "abortion" in the Weldon Amendment or the ACA, courts "give the term its ordinary meaning."

---

[30] Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1) & (2), 125 Stat. 786, 1111 (2011).

*See Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012). Medical dictionaries show the "ordinary meaning" includes the termination of an embryo.[31] The Mandate requires Wheaton's health plan to provide drugs and devices that the FDA admits can terminate an embryo, and the Mandate discriminates against Wheaton's plan for failing to do so. Thus, some of the Mandate's required services qualify as "abortion" in contravention of the Weldon Amendment and the ACA and, thus, the APA.

### 4. The Mandate exceeds statutory authority.

The Mandate violates statutory authority by imposing duties and costs on insurance companies, and setting up a scheme of administrative fee reductions, which were not authorized by the ACA. Defendants' sole response is that Wheaton lacks standing. But, as with Wheaton's other ACA and Weldon Amendment claims, the regulations directly impact the relationship—and the contract—between Wheaton and its TPA, and interference with contractual rights is legal prejudice sufficient to confer standing. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 501 (7th Cir. 2012). And they also prevent insurance issuers from offering—and Wheaton from buying—the conscience-compliant insurance plans that remain available to fully exempt churches and grandfathered employers. This is enough to give Wheaton standing to challenge the law. *See Bridenbaugh*, 227 F.3d at 849 (allowing Indiana wine consumers to challenge a state law banning wine shipments by out-of-state wineries without a license); *Ezell*, 651 F.3d at 695 (allowing city residents who owned guns to challenge a ban on firing ranges within city limits).

---

[31] *See, e.g.*, *Stedman's Medical Dictionary* 4 (28th ed. 2006) ("abortion" is the "[e]xpulsion from the uterus of an embryo or fetus [before] viability.").

## III. Summary judgment is premature on Wheaton's intentional discrimination claims and its APA claims.

Defendants move for summary judgment on Counts III, IV, VI, VII, VIII, X, XI, XII, XIII, XV, and XVI, which, in part, allege intentional discrimination via Defendants' decision to impose the Mandate on Wheaton, and other matters that require factual development. Since, as Wheaton makes clear in its contemporaneous Rule 56(d) motion, discovery is needed on all these points, Defendants' motion for summary judgment on these claims is premature. *Peate v. McCann*, 294 F.3d 879, 881 (7th Cir. 2002) (reversing grant of summary judgment where the court had permitted only "limited discovery").

### CONCLUSION AND REQUEST FOR ORAL ARGUMENT

Wheaton respectfully requests that this Court enter summary judgment in its favor on Counts IV, V, VII, XIII, IX and I of its Complaint, and that it deny the government's motion for summary judgment and dismissal. Wheaton also requests oral argument.

Respectfully submitted,

/s Mark Rienzi

Mark Rienzi
Adèle Auxier Keim
Diana Verm
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K St. NW, Ste. 220
Washington, DC 20007
(202) 955-0095 (tel.)
(202) 955-0090 (fax)

Christian Poland
BRYAN CAVE LLP
161 N. Clark St., Suite 4300
Chicago, IL 60601-3315
(312) 602-5085 (tel.)
Christian.Poland@bryancave.com

*Attorneys for Plaintiff Wheaton College*

38

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Court's ECF system on April 22, 2014, and was thereby electronically served on counsel for Defendants.


*s/ Mark L. Rienzi*
Mark L. Rienzi
*Counsel for Plaintiff*