# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WHEATON COLLEGE, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 1:13-cv-08910 |
| SYLVIA MATHEWS BURWELL, et al., | ) ) | Judge Robert M. Dow, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wheaton College is a Christian liberal arts college that provides health insurance benefits to its employees and students and opposes abortion and abortifacient contraceptives on religious grounds. Plaintiff alleges that its religious beliefs will be impermissibly and substantially burdened by regulations promulgated pursuant to the Patient Protection and Affordable Care Act ("ACA") that require group health insurance plans to cover "all Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." 78 Fed. Reg. 39870, 39870 (July 2, 2013) ("the Mandate"). Plaintiff is eligible for an accommodation that would excuse it from complying with the Mandate, but alleges that it should be eligible for an exemption rather than an accommodation and, moreover, that complying with the procedures necessary to obtain an accommodation – namely, completing and submitting to its third-party administrator "EBSA Form 700—Certification" – will "make it morally complicit in the wrongful destruction of human life." Plaintiff argues that the Mandate violates the First Amendment and the Religious Freedom Restoration Act ("RFRA") and was enacted in violation of the Administrative Procedures Act ("APA"). Plaintiff has requested a permanent injunction enjoining Defendants

from enforcing the Mandate, which Defendants may enforce against Plaintiff as early as July 1, 2014.

Defendants ("the Government") moved to dismiss all sixteen counts of Plaintiff's complaint or, in the alternative, for summary judgment. See [25]. Plaintiff cross-moved for summary judgment on six counts, see [41], [44], and also sought additional discovery under Federal Rule of Civil Procedure 56(d) in the event that its cross-motion were denied. See [43]. The parties fully briefed these motions, and the Court has taken their submissions under advisement. Because (1) the Mandate will take effect for Plaintiff on July 1, 2014, and (2) two cases currently pending before the United States Supreme Court, *Sebelius v. Hobby Lobby Stores, Inc.*, No. 13-354, and *Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-356, may affect the ultimate resolution of at least some of Plaintiff's claims, Plaintiff has moved for a preliminary injunction with respect to each of the six counts on which it has cross-moved for summary judgment. See [57], [58]. The Government opposes the motion [59].[1]

For the reasons stated below, the Court respectfully denies Plaintiff's motions for preliminary injunction [57], [58]. To the extent that *Hobby Lobby* and *Conestoga* call into question any material aspect of the Seventh Circuit's controlling decision in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), any party may file a motion for reconsideration of this order. This order is also subject to reconsideration on the Court's own motion.

This matter is set for a telephonic status conference on 6/30/2014 at 10:00 a.m.

---

[1] Briefing on the motions was delayed until after the Seventh Circuit issued its decision in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), and thus was not complete until May 19. The Court convened a conference call with counsel on June 9 to discuss how to proceed in light of the fact that the Supreme Court had not yet issued its rulings in the *Hobby Lobby* and *Conestoga* cases. During that call, the parties agreed to an expedited schedule for the filing of the briefs in support of and in opposition to the preliminary injunction motion.

I.      **Background**

Plaintiff is a Christian liberal arts college located in Wheaton, Illinois. Plaintiff is not affiliated or associated with any one particular church, though it characterizes its beliefs as "Evangelical Protestant." [41] at 10. All members of Plaintiff's "community," *i.e.*, its employees and students, "assent to [Plaintiff's] religious beliefs, including its beliefs about the sanctity of life." *Id*. at 3. Pursuant to its beliefs about the sanctity of life, Plaintiff opposes contraceptive methods that "may act by killing a human embryo," including emergency contraception like Plan B and ella. *Id.* "As part of its religious convictions, [Plaintiff] promotes the well-being and health of its students and employees * * * [by] provi[ding] generous health services and health insurance." [1] ¶ 38. The health insurance that Plaintiff currently offers covers some contraceptives but not those to which Plaintiff is religiously opposed. See [41] at 5. Plaintiff offers its health insurance pursuant to six plans: two insured HMO plans, a PPO plan,[2] two self-funded prescription drug plans, and an insured student health plan. See *id.* at 4. The "plan year" for Plaintiff's insurance plans begins on July 1, 2014. [1] ¶¶ 46, 155.

The Seventh Circuit recently provided a comprehensive discussion of the genesis and mechanics of the ACA, the Mandate, and the exemption and accommodation at issue here in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014). As the parties are familiar with – and generally in agreement about – these matters, and the Court anticipates addressing them more robustly in its upcoming summary judgment ruling, the Court incorporates the Seventh Circuit's discussion by reference and includes here only those background details most pertinent to the resolution of the instant motion.

---

[2] Plaintiff's PPO plan is "grandfathered" for purposes of the ACA, such that it is not subject to the Mandate.

The ACA requires employers with 50 or more full-time employees to provide health insurance for their full-time employees or pay a penalty on their federal tax return. See 26 U.S.C. § 4980H. The ACA also requires that non-exempt group health plans offer coverage for certain preventive services without cost-sharing requirements. See 42 U.S.C. § 300gg-13. These preventive services include "with respect to women, such additional preventive care and screenings * * * as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg-13(a)(4). The HRSA's guidelines include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." HHS, Women's Preventive Health Services Guidelines, http://www.hrsa.gov/womenshealthguidelines. Failure to provide the required coverage for contraception results in a variety of negative tax consequences to the employer, including a daily tax of $100 per day per individual "to whom such failure relates." 26 U.S.C. §§ 4980D(a), (b)(1). Employers who do not provide insurance at all (despite being required to do so) face an annual tax of $2,000 per full-time employee. See 26 U.S.C. § 4980H. Plaintiff avers that it faces up to $34.8 million in annual tax penalties under these provisions.

As the Seventh Circuit explained in *Notre Dame*, "the government, some months after the enactment of the Affordable Care Act, created by administrative regulation an exemption from the guidelines." *Notre Dame*, 743 F.3d at 550. The exemption applies only to "religious employers," those that are "organized and operate[] as a non-profit entity and [are] referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). After some pushback from religious entities that did not fall within the scope of the narrow exemption, the Government promulgated new regulations implementing the

4

accommodation at issue here. See 78 Fed. Reg. 39870, 39875-90 (July 2, 2013); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R. § 147.131(b). Per those regulations, which Plaintiff alleges were promulgated in contravention of the APA, religious organizations that do not fall within the ambit of the exemption may seek an accommodation from the Mandate on religious grounds. An organization seeking the accommodation must satisfy four requirements:

> (1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
> (2) The organization is organized and operates as a nonprofit entity.
> (3) The organization holds itself out as a religious organization.
> (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b). There is no dispute that Plaintiff satisfies requirements (1)-(3); its objection is to the self-certification required by 45 C.F.R. § 147.131(b)(4).

Employers seeking the accommodation must execute the self-certification form and furnish a copy to their health insurance issuers or third-party administrators. The recipient "issuers" "may not require any documentation other than the copy of the self-certification from the eligible organization regarding its status as such." 45 C.F.R. § 147.131(c)(1). The recipient issuers are required to "[e]xpressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and [p]rovide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries so long as they remain enrolled in the plan." *Id.* § 147.131(c)(2)(i). Additionally, issuers are barred from imposing any cost-sharing requirements

"on the eligible organization, the group health plan, or plan participants or beneficiaries," and must "segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive services." *Id.* § 147.131(c)(2)(ii). The regulations prohibit accommodated entities from "(1) [d]irectly or indirectly interfering with a third party administrator's efforts to provide or arrange separate payments for contraceptive services for participants or beneficiaries in the plan and (2) directly or indirectly seeking to influence a third party administrator's decision to provide or arrange such payments," 78 Fed. Reg. 39870, 39879-80 (July 2, 2013); a footnote clarifies that "[n]othing in these final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." *Id.* at 39880 n.41.

Plaintiff contends that "signing and the delivering EBSA Form 700 to its insurer and TPA [third-party administrator] would make it morally complicit in the wrongful destruction of human life." [41] at 6. Plaintiff further contends that the self-certification form would give its TPA "the legal authority to provide contraceptives to Wheaton's employees at no costs" and would undermine the contract between Plaintiff and its TPA because Plaintiff "is the plan administrator and fiduciary, and Wheaton's TPA has no authority to change the terms of the plan without Wheaton's express permission." [41] at 5. Plaintiff also argues that complying with the regulations barring it from interfering with or seeking to influence the TPA's provision of contraception, which Plaintiff terms the "gag rule," "would prevent Wheaton from speaking freely about its objections to life-ending emergency contraceptives or instructing its TPA to provide some contraceptives but not others." *Id.* at 6. Yet, if Plaintiff does not comply with the Mandate and associated regulations, or complete and submit to its TPA the self-certification form, Plaintiff will be subject to a sizeable tax. Plaintiff seeks preliminary injunctive relief from

this conundrum under the Religious Freedom and Restoration Act ("RFRA"), the First Amendment's religion and free speech clauses, and the Administrative Procedure Act.

**II.     Legal Standard**

"To obtain a preliminary injunction, the moving party must show that it has '(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Wis. Right to Life, Inc. v. Barland*, --- F.3d ---, 2014 WL 1929619, at *23 (7th Cir. May 14, 2014) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011)). The threshold for establishing likelihood of success is relatively low. *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). The moving party must only "present a claim plausible enough that (if the other preliminary injunction factors cut in their favor), the entry of a preliminary injunction would be an appropriate step." *Id.* at 783.

"If this showing is made, 'the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest.'" *Wis. Right to Life*, 2014 WL 1929619, at *23 (quoting *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)). "The 'equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor.'" *Id.* (quoting *Korte*, 735 F.3d at 665). In First Amendment cases such as this one, the likelihood of success on the merits is usually the determinative factor. *Id.* at *24. The loss or impingement of freedoms protected by the First Amendment "unquestionably constitutes irreparable injury," *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), and "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 590 (quoting *Christian Legal*

*Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)); see also *Smith v. Executive Director of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014).

## III. Analysis

### A. Likelihood of Success on the Merits

#### 1. RFRA

Under RFRA, the federal government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). A plaintiff states a prima facie case under RFRA by demonstrating that governmental action substantially burdens its sincere religious exercise. See *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 428 (2006); *Notre Dame*, 743 F.3d at 554. If the plaintiff clears that hurdle, the burden shifts to the government to demonstrate that the challenged action was taken in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. See *Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013).

Here, Plaintiff contends that its sincere religious exercise will be substantially burdened if it is required to complete the EBSA Form 700. Plaintiff argues that it "cannot execute the self-certification form the government has provided without making itself morally complicit in the government's scheme," [41] at 20, because doing so would "facilitate use of emergency contraceptives in violation of its sincere beliefs," *id.* at 22, and would materially alter its contractual relationship with its TPA by imposing upon the TPA a duty to become a plan administrator with respect to the objected-to contraceptives. See *id.* at 22-23. Plaintiff also

8

contends that the Government cannot shoulder its burden of demonstrating that enforcement of the Mandate is the least restrictive means of advancing a compelling governmental interest.

Although there is no dispute that Plaintiff's religious beliefs are sincere, the Court concludes that Plaintiff has no likelihood of success in establishing a substantial burden on its religious exercise, at least as the law in this and the only other circuit to have directly engaged the issue currently stands. In *Notre Dame*, the Seventh Circuit squarely rejected the University of Notre Dame's contention that "filling out the form and sending it to the companies * * * 'triggers' their coverage of the contraception costs of the university's female employees and students, and that this makes the university an accomplice in the provision of contraception." *Notre Dame*, 743 F.3d at 554. As the Seventh Circuit explained, "[f]ederal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services." *Id.* The Sixth Circuit recently came to the same conclusion in *Michigan Catholic Conference & Catholic Family Services v. Burwell*, --- F.3d ---, 2014 WL 2596753, at *8-10 (6th Cir. June 11, 2014). These cases strongly suggest that, unless the Supreme Court's rulings in *Hobby Lobby* or *Conestoga* significantly change the legal landscape, Plaintiff's likelihood of demonstrating that the accommodation process substantially burdens its religious exercise is insufficient to meet the threshold required to warrant a preliminary injunction on this basis.[3]

The Court is not persuaded at this juncture that Plaintiff's situation (or legal arguments) are distinguishable from those rejected in *Notre Dame* and *Michigan Catholic Conference*.

---

[3] The Court is aware that the *Notre Dame* panel decision was not unanimous and that Judge Flaum filed a well-reasoned dissenting opinion explaining why he would have granted a preliminary injunction forbidding the government from penalizing the university for refusing to comply with the self-certification requirement. See *Notre Dame*, 743 F.3d at 562 (Flaum, J., dissenting). However, because that view did not prevail with the panel majority and the petition for rehearing and rehearing en banc was denied, Plaintiff is swimming against the tide of controlling law in this circuit, which this Court is duty-bound to apply.

Plaintiff rightly points out that, unlike Notre Dame, it has not yet signed the EBSA Form 700. But that is of little moment, since Plaintiff's theory rises and falls on the appeals court's conclusion that federal law, not Plaintiff's execution of the EBSA Form 700, is the source of the TPA's and health insurer's obligations. Plaintiff *is* distinguishable from Notre Dame in that it has furnished the Court with (excerpts of) its insurance contracts and argues that the provisions of the contracts would be materially altered if it executes and delivers the self-certification. See [41-4]; *Notre Dame*, 743 F.3d at 555. However, even though the Seventh Circuit did not comprehensively address the contract argument in *Notre Dame* due to Notre Dame's forfeiture and failure to present evidence "that its contract with Meritain forbids the latter to be a plan fiduciary," the court nonetheless pronounced Notre Dame's argument "unconvincing." *Notre Dame*, 743 F.3d at 555. In reaching this conclusion, the Seventh Circuit explained that "the university has not been told to name Meritain as a plan fiduciary. Rather, the signed form '*shall be treated* [by the government] *as* a designation of the third party administrator as the plan administrator under section 3(16) of ERISA for any contraceptive services required to be covered.'" *Id.* (quoting 29 C.F.R. § 2510.3-16(b)). The Seventh Circuit appears to have been drawing a distinction between treating an insurer or TPA as a plan administrator for some purposes and formally imbuing the entity with full fiduciary responsibilities. The Court finds this distinction persuasive, particularly in light of the dearth of authority in support of Plaintiff's argument and the broader principle that parties in many circumstances cannot contract around statutory obligations. See *United States v. Lupton*, 620 F.3d 790, 800 (7th Cir. 2010) ("Parties cannot contract around definitions provided in criminal statutes."); *Equal Employment Opportunity Comm'n v. Ind. Bell Tel. Co.*, 256 F.3d 516, 532 (7th Cir. 2001) (en banc) (Flaum, C.J., concurring in part and dissenting in part) ("It is uncontested that employers cannot use

10

collective bargaining agreements to contract around anti-discrimination laws like Title VII."). Accordingly, the Court concludes that Plaintiff has not established a likelihood of success on the merits of its RFRA claim at this time.

### 2. First Amendment Religion Clauses

Plaintiff next contends that "[t]he Mandate violates the Religion Clauses because it impermissibly discriminates among religious institutions asserting the exact same religious objection. Some favored 'religious employers' are exempt from the Mandate and the requirement to execute EBSA Form 700. Yet others like Wheaton, who wish to engage in the exact same religious exercise as 'religious employers,' are forced to comply or pay massive penalties." [41] at 9. Plaintiff asserts that the Government's implementation of the exemption and accommodation draws "explicit and deliberate distinctions between different religious organizations" and "violate[s] both the Free Exercise and Establishment Clause." *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 246 n. 23 (1982)).

The Seventh Circuit expressly rejected Plaintiff's argument in *Notre Dame*. There, Notre Dame argued that the exemption violated the Establishment Clause by "favor[ing] certain types of religious organizations (churches or other houses of worship) over others (like Notre Dame)." *Notre Dame*, 743 F.3d at 560. The Seventh Circuit observed that "religious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities without these advantages being thought to violate the establishment clause." *Id.* (citations omitted). The court further noted that the distinction was not based on denomination, and held that the Establishment Clause "does not require the government to equalize the burdens (or benefits) that laws of general applicability impose on religious institutions." *Id.* The Sixth Circuit likewise rejected a similar challenge to the exemption and accommodation in *Michigan*

11

*Catholic Conference*. See 2014 WL 2596753, at *16-17. The Sixth Circuit quoted the same Supreme Court case that Plaintiff does here for the proposition that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," *id.* at *16 (quoting *Larson*, 456 U.S. at 244), and concluded that "[t]he line that the exemption and accommodation framework draws between eligibility for the exemption and for the accommodation is based on organizational form and purpose, not religious denomination." *Id.* The Sixth Circuit also persuasively distinguished *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), on which Plaintiff relies here. See *Michigan Catholic Conference*, 2014 WL 2596753, at *16; [41] at 9-10; [52] at 5-6. The Court finds particularly compelling the Sixth Circuit's observation that some of the Catholic plaintiffs in *Michigan Catholic Conference* were eligible for the exemption and some for the accommodation; this is a clear indication that denomination is not the relevant metric for the exemption. See *Michigan Catholic Conference*, 2014 WL 2596753, at *16.

The "constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." *Larson*, 456 U.S. at 245. And here, Plaintiff does not separate out its Religion Clause contentions. See [41] at 9-12. To the extent that Plaintiff is alleging that the Mandate is not neutral or generally applicable, the Court finds persuasive the Sixth Circuit's contrary conclusion. See *Michigan Catholic Conferenc*, 2014 WL 2596753, at *14-16. Plaintiff also makes the additional argument that the Government violated its First Amendment rights by "press[ing] ahead with its narrow church-focused exemption in the face of" evidence from Plaintiff and other religious colleges that their full-time administrators

and faculty[4] share the faith of the institutions. See [41] at 12. Notre Dame raised essentially the same point, however, see *University of Notre Dame v. Sebelius*, Case No. 13-3853, Dkt. No. 20, at 15 (7th Cir. Jan. 13, 2014), and the Seventh Circuit implicitly concluded that this fact "add[ed] nothing to [Notre Dame's] RFRA arguments" and did not "warrant discussion." *Notre Dame*, 743 F.3d at 560. The Court finds itself constrained by controlling circuit precedent to reach the same conclusion at this juncture.

### 3. APA

The APA authorizes federal courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiff contends that the Government's enactment of the Mandate, exemption, and accommodation framework should be set aside as violative of the APA because it "ignored key aspects of the problem before them, relied on misinterpretations of the facts and laws, and relied on false assumptions about the religious beliefs of employees at Evangelical Protestant institutions like Wheaton." [41] at 13-14. Namely, Plaintiff argues that the Mandate was enacted in contravention of the APA because the Government declined to widen the scope of the exemption to include Plaintiff even after Plaintiff informed the Government that its employees (its faculty and administrators, at least) embrace its religious views. See *id.* at 13-14.

Plaintiff's APA argument is not persuasive. First, as Plaintiff recognizes in its brief, see [41] at 12, the APA argument is very closely related to the religion clauses argument discussed above. Both theories fundamentally challenge the line that the Government has drawn between the exemption and the accommodation. (Notably, however, Plaintiff does not directly contend that the Mandate violates the APA because it is unconstitutional. See [41] at 12-14.) In light of

---

[4] The statement from the Council for Christian Colleges and Universities said nothing about the universities' lower-level employees or students necessarily sharing their religious beliefs. See [41] at 12; [41-11].

13

the Seventh Circuit's clear rejection of the constitutional argument, it is difficult to envision a scenario in which Plaintiff could prevail on its closely related APA argument, which affords the Government a significantly more deferential standard of review. Second, to the extent that Plaintiff's APA argument is distinct from its religion clauses arguments, the Court is not convinced at this time that it has any likelihood of success on the merits. Plaintiff essentially contends that because the Government ignored or failed to consider a single piece of evidence when drafting regulations, the resultant regulations necessarily are contrary to the evidence. This argument conflates a single piece of evidence with "the evidence" as a whole. In most every contentious case or rule-making process, the decision-maker is presented with conflicting evidence and is tasked with rendering a decision in accordance with the evidence overall, not merely a single piece. Here, Plaintiff asserts that the Government disregarded its evidence and relied instead on a purportedly faulty assumption that the "church-focused religious employer exemption was justified because church employees were more likely than the employees of other religious non-profits to agree with their employers' religious views." [41] at 13. Plaintiff's evidence may have supported the contrary conclusion (at least as to high-level employees at the signatory colleges), but there is no indication at this time that the bulk of other submitted evidence did as well. The Government is required only to provide a "concise general statement" of a rule's basis and purpose, 5 U.S.C. § 553(c), not to furnish a detailed explanation that specifically addresses every single evidentiary submission made to it during a notice-and-comment period. Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits of its APA claim.

### 4. First Amendment Free Speech Clause

Plaintiff contends that the Mandate violates the First Amendment's free speech clause because the Mandate "forces Wheaton to speak against its will, and in a way that contradicts its beliefs." [41] at 14. The first prong of Plaintiff's argument is that the requirement that it complete the self-certification form is tantamount to the Government mandating speech that Plaintiff otherwise would not make. See *id.* (citing *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006)). Plaintiff asserts that the EBSA Form 700 "triggers payments for the use of abortifacient drugs and services, including for 'education and counseling' about those products to Wheaton's plan participants." *Id.* As discussed above, the Seventh Circuit has squarely rejected the "trigger" theory. Indeed, both the Seventh and Sixth Circuits have concluded that the self-certification form "triggers the entities' *disassociation* from what they deem to be objectionable coverage." *Michigan Catholic Conference*, 2014 WL 2596753, at *13; see *Notre Dame*, 743 F.3d at 557-58. To the extent that Plaintiff's free speech argument is predicated on the "trigger" theory, it cannot succeed absent a change in the controlling law.

Plaintiff also contends that the so-called "gag rule" violates its free speech rights by prohibiting it from "request[ing] that its TPAs not use its plans to provide emergency contraceptives." [41] at 17. Plaintiff rightly points out that the Seventh Circuit's ruling in *Notre Dame* does not foreclose this argument. To the contrary, the Seventh Circuit recognized that "most speech or writing intended to influence someone else's decision – to persuade someone to do or not do something – *is* protected" by the First Amendment, *Notre Dame*, 743 F.3d at 560, and was "troubled by the seeming vagueness of the regulation as drafted and as further muddied in the footnote in the commentary." *Id.* at 561. The Seventh Circuit did not provide further guidance, however, because "the parties have failed to place the issue in focus." *Id.* The

Seventh Circuit noted that Notre Dame "hasn't told us what it wants to say but fears to say (except that it at least wants to be able to tell Meritain not to provide contraceptive coverage at all – which sounds like urging civil disobedience) and the government hasn't clearly embraced an interpretation of the regulation that would give rise to the concerns we've expressed." *Id.* The Sixth Circuit found similar impediments to making a merits ruling on this point in *Michigan Catholic Conference*. See *Michigan Catholic Conference*, 2014 WL 2596753, at *14. Plaintiff here has spelled out in some detail the contours of what it wishes to say but fears that it cannot without running afoul of the regulation.

The Government responds that the "gag rule" is "meant only to prevent a self-certifying organization from using its economic power into not fulfilling its legal obligation to provide contraceptive coverage." [49] at 13. Plaintiff and the Government each have pointed to one district court case supporting their view. See *Roman Catholic Archbishop of Washington v. Sebelius*, --- F. Supp. 2d ---, 2013 WL 6729515, at *38 (D.D.C. Dec. 20, 2013) (Plaintiff); *Michigan Catholic Conference v. Sebelius*, --- F. Supp. 2d ---, 2013 WL 6838707, at *11 (W.D. Mich. Dec. 27, 2013) (Government).

Based on the record currently before it, the Court concludes that Plaintiff has demonstrated some likelihood of success on the merits of its "gag rule" claim. That being said, however, it is clear from Plaintiff's briefing and its proposed order that what it seeks in the way of immediate and preliminary relief is an injunction barring the Government from enforcing the Mandate and requiring Plaintiff to sign the EBSA Form 700. It is unclear to the Court how an injunction as to enforcement of the "gag rule" could give Plaintiff this relief; it would still need to fill out the form. The Court will explore with counsel at the next status hearing whether Plaintiff wishes to pursue preliminary injunctive relief on the "gag rule" aspects of the

16

regulations or whether it is content to await the Court's forthcoming summary judgment ruling on that issue. In either case, the Court may request supplemental briefing to ascertain the parties' views on the content of any injunction order to which Plaintiff may be entitled on this issue. See Fed. R. Civ. P. 65(d)(1)(B) (requiring courts to state terms of an injunction order "specifically").

### B. Remaining Factors

Because the majority opinion in *Notre Dame* stands squarely in the path of the principal relief that Plaintiff seeks, Plaintiff cannot demonstrate the requisite likelihood of success on the merits of its claims. Accordingly, the motion for preliminary injunction must be denied. See, *e.g., Cox v. City of Chi.*, 868 F.2d 217, 223 (7th Cir. 1989). In the interest of completeness, however, the Court will briefly address the other factors that are considered at the preliminary injunction stage.

The other two threshold elements that Plaintiff must prove to support the issuance of a preliminary injunction are that it (1) has no adequate remedy at law and (2) will suffer irreparable harm if the injunction is not issued. These two requirements tend to merge. See *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.* An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997). Here, there is no question that Plaintiff has made these showings. The loss or impingement of freedoms protected by the First Amendment "unquestionably constitutes irreparable injury," *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)

(quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), and such an injury cannot be remedied by the receipt of damages.

The Court likewise concludes that at least in the short term – that is, between today and the time by which the Court will be in position to rule on the summary judgment motions with the benefit of the parties' views on *Hobby Lobby* and *Conestoga* – the balance of harms strongly weighs in Plaintiff's favor. See *Korte*, 735 F.3d at 665 ("[T]he court weights the competing harms to the parties if an injunction is granted or denied and also considers the public interest."). The potential harms to Plaintiff are substantial. If *Hobby Lobby* and *Conestoga* do not substantially change the legal landscape, Plaintiff will be faced with the Hobson's choice of adhering to its religious beliefs or being subjected to steep financial penalties. The short-run costs to the Government, on the other hand, are purely financial and will be minimal in the time frame referenced above. The Government would at most lose for a short period of time its ability to collect tax penalties from Plaintiff, an ability that it currently lacks as to many similarly situated entities whose insurance "plan years" happen to begin later in the year. See 78 Fed. Reg. 39872. Nonetheless, these considerations do not come into play in light of Plaintiff's current inability to demonstrate that it is likely to prevail on the merits of its claims.

## IV. Conclusion

For the reasons stated above, the Court respectfully denies Plaintiff's motions for preliminary injunction [57], [58]. To the extent that *Hobby Lobby* and *Conestoga* call into question any material aspect of the Seventh Circuit's controlling decision in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), any party may file a motion for reconsideration of this order. This order is also subject to reconsideration on the Court's own motion. This matter is set for a telephonic status conference on 6/30/2014 at 10:00 a.m.

Dated: June 23, 2014  _____
Robert M. Dow, Jr.
United States District Judge