CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-2396

WHEATON COLLEGE,

*Plaintiff-Appellant*,

*v.*

SYLVIA MATHEWS BURWELL, Secretary of Health and Human Services, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 8910 — **Robert M. Dow, Jr.**, *Judge*.

ARGUED JUNE 10, 2015 — DECIDED JULY 1, 2015

Before POSNER, WILLIAMS, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Wheaton College is a liberal arts college in Illinois that although not owned by or affiliated with any church (in other words, it is nondenominational) is deeply committed to evangelical Protestantism. Although Wheaton hires faculty and staff from a variety of Christian traditions, and admits students of varied faiths, it requires all members of the college community, which is to say all

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 2 of 18 PageID #:26656
Case: 14-2396 Document: 00711592614 Filed: 01/08/2015 Pages: 18

2                                                        No. 14-2396

employees and all students, to sign a "Community Covenant" that among other things requires them to "uphold the God-given worth of human beings, from conception to death." (Despite the centrality of the covenant to the college's argument, its lawyers did not bother to include it in the appellate record. We found it online, at Wheaton College, "Community Covenant," www.wheaton.edu/about-wheaton/community-covenant (visited June 17, 2015, as were the other websites cited in this opinion).) The Covenant does not mention contraception, but the passage we quoted implies, and Wheaton believes, that what is called "emergency contraception," which means contraception after intercourse, is forbidden on religious grounds if it can destroy a fertilized ovum. Wheaton also opposes intrauterine devices (IUDs) that whether inserted before or after intercourse may prevent the implantation of a fertilized ovum. The college implements its belief about emergency contraception and IUDs by excluding coverage of them from its health plans.

Contraception that prevents fertilization rather than destroying a fertilized ovum is referred to by the college as "traditional contraception," and the college has made clear that it does not oppose such contraception. Of the 20 types of female contraceptive approved by the Food and Drug Administration the college disapproves only emergency-contraceptive drugs and certain IUDs.

The college brought this suit against the federal government complaining that the Affordable Care Act is infringing its religious rights—in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, as well as the First Amendment—by making it complicit in the provision of

No. 14-2396 3

emergency-contraceptive coverage to its employees and students. The suit is pending in the district court; before us is the college's appeal from the denial of a preliminary injunction.

The Introduction to the college's opening brief begins with the following inaccurate statement: "This case arises from the government's effort to use Wheaton College's health plans to distribute emergency contraceptive drugs." And the first sentence of the reply brief states in like vein that "Wheaton has benefit plans, and the government wants to use them." At oral argument the college's lawyer insisted that the government was "using our plan" and "putting [additional terms] into our contract." If Wheaton College is wrong, and the government is not trying to "use" the college's health plans to provide insurance coverage for emergency contraceptives (of which the best known are "morning after" pills), or to add terms to those plans, the college has no case. This point is underscored by the fact that the only articulated relief it seeks in this court is a "remand with an injunction [we assume the college means a preliminary injunction] prohibiting the government's efforts to use Wheaton's plans." True, it says it also wants "an injunction against the government during the pendency of this appeal requiring it to treat Wheaton as an exempt 'religious employer'" (it means an injunction requiring such treatment, not an injunction against the government's requiring such treatment); but at the oral argument the college's lawyer indicated that the college's only objection is to the government's "using" Wheaton's health plans to get around the college's objection to emergency contraception. Actually there are no efforts by the government to take over

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 4 of 18 PageID #:26658
Case: 14-2396 Document: 00711592614 Filed: 01/08/2015 Pages: 18

4 No. 14-2396

Wheaton's health plans, as Wheaton contends. Acts cannot be enjoined that are neither actuality nor threat.

The contraception provisions of the federal Act and its implementing regulations do not alter or annex college or other institutional health plans that fail to provide coverage for some or all contraceptives. In the case of religious objectors to such coverage, the Act requires providers of health insurance (to the objectors' staff, students, etc., and third-party administrators, which usually are also insurance companies) to cover certain preventive services without cost to the insured. The services include "all Food and Drug Administration approved contraceptive methods." 42 U.S.C. § 300gg-13(a)(4); 45 C.F.R. § 147.130(a)(1)(iv); Health Resources & Services Administration, "Women's Preventive Services Guidelines," www.hrsa.gov/womensguidelines. The college does not challenge the government's authority to require that all approved methods of contraception be available to women at no cost to them. What it challenges is the requirement that it notify its insurers or the government that it is claiming a religious exemption and that it give the government the insurers' names so that the government can direct the insurers to provide emergency-contraception coverage.

We should note that in its May 2014 response to the "Plaintiff's Statement of Additional Material Facts," the government emphatically denied that it has approved any abortifacient contraceptive; it said that "no FDA-approved contraceptive methods cause the demise of an early embryo as part of their mechanism of action." True, the government defines abortion as the termination of a pregnancy, and defines pregnancy as (beginning) the moment an embryo is

No. 14-2396 5

implanted in the wall of the uterus (see 45 C.F.R. § 46.202(f)), whereas Wheaton defines "conception," which it regards as the first stage in a pregnancy, as the creation of a fertilized ovum. It takes about five or six days for a fertilized ovum to travel down a fallopian tube and begin the process of implantation in the uterine wall. See UCSF Medical Center, "Conception: How it Works," www.ucsfhealth.org/education/conception_how_it_works/. Wheaton considers any drug that kills the fertilized ovum by preventing implantation to be an abortifacient.

The FDA's "Birth Control Guide" says in apparent conformity with Wheaton College's view that two emergency contraceptives, Plan B and ella, may prevent implantation of a fertilized egg. The government has not disputed (which is not to say that it necessarily accepts) this view, but scientific studies dispute it. According to *The Emergency Contraception Website* (operated by the Office of Population Control of Princeton University and the Association of Reproductive Health Professionals), "How Does Emergency Contraception Prevent Pregnancy?," http://ec.princeton.edu/questions/ecwork.html, "There is no evidence to suggest that either of the FDA-approved emergency contraceptive options, levonorgestrel (LNG, such as *Plan B One-Step*, *Take Action*, *Next Choice One Dose* or *My Way*) or ulipristal acetate (UPA, such as *ella*) works after an egg is fertilized." See also James Trussell, Elizabeth G. Raymond, and Kelly Cleland, "Emergency Contraception: A Last Chance to Prevent Unintended Pregnancy," http://ec.princeton.edu/questions/ec-review.pdf. For a lucid review of the scientific evidence, see Pam Belluck, "No Abortion Role Seen for Morning-After Pill," *New York Times*, June 6, 2012, p. A1. Asked about this at oral argument, how-

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 6 of 18 PageID #:26660
Case: 14-2396    Document: 00712592614    Filed: 07/01/2015    Pages: 18

6                                                    No. 14-2396

ever, Wheaton College's lawyer acknowledged ignorance of the scientific literature.

Whether emergency contraceptives prevent implantation is relevant to whether Wheaton has any religious basis for opposing them, given its acceptance of what it calls traditional contraception, but does not affect the outcome of this appeal. The government, while it denies that the emergency contraceptives approved by the FDA and hence subject to the contraception-coverage provisions of the Affordable Care Act are abortifacients, has not made an issue of Wheaton's religious sincerity. Moreover, the scientific literature does not challenge the capacity of IUDs to prevent implantation, so Wheaton's religious objection to those devices, at least, is not affected by scientific controversy.

As explained in too many cases to warrant citation, the Affordable Care Act requires college health insurance plans (including plans in which an insurance company merely administers a plan insured by the college itself and is therefore a third-party administrator rather an insurer) to cover the 20 types of FDA-approved contraceptives. But a college can refuse to include in its health plans coverage of drugs of which it disapproves on sincere religious grounds. To exercise this right of refusal the college has only to notify its health insurers, or if it prefers the Department of Health and Human Services, of its unwillingness to provide coverage. The insurers are then obligated by the Affordable Care Act to provide the coverage directly to requesting students, faculty, and staff. The college and its health plans are thus bypassed.

So when Wheaton College tells us that it is being "forced" to allow "use" of its health plans to cover emergen-

No. 14-2396 7

cy contraceptives, it is wrong. It's being "forced" only to notify its insurers (including third-party administrators), whether directly or by notifying the government (which will forward the notification to the insurers), that it will *not* use its health plans to cover emergency contraception, that it is out of the loop, that the insurers will have to deal directly with the students, faculty, and staff, bypassing the college health plans, which remain in force, so far as contraceptive coverage is concerned, only for the contraceptives that the college does not disapprove of on religious grounds. The college doesn't even have to inform the insurers of their obligation to provide coverage; the government as we said does that if the college has told the government that it refuses to provide the coverage.

Once informed by the government of the college's objection, the insurers are required by the Affordable Care Act and implementing regulations to notify the members of the college community of their right to coverage by the insurers. In deference to religious sensibilities the government directs the insurers to separate notification to the community members from the insurers' communications with them concerning the *college*'s health plans, and to include a statement that the college is *not* funding or administering contraceptive (in Wheaton's case just emergency-contraceptive) coverage. 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(d). Call this "using" the health plans? We call it refusing to use the health plans.

The upshot is that the college contracts with health insurers for contraceptive coverage exclusive of coverage for emergency contraceptives, and the Department of Health and Human Services contracts with those insurers to cover

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 8 of 18 PageID #:26662
Case: 14-2396　　Document: 00712592614　　Filed: 07/01/2015　　Pages: 18

8　　　　　　　　　　　　　　　　　　　　　　　　　　　　No. 14-2396

emergency-contraceptive benefits. The latter contracts are not part of the college's health plans, and so the college is mistaken when it tells us that the government is "interfering" with the college's contracts with its insurers. The contracts, which do not require coverage of emergency contraception, are unchanged. New contracts are created, to which the college is not a party, between the government and the insurers.

After the district court denied the preliminary injunction sought by Wheaton College and we denied a temporary injunction pending appeal, the college sought relief from the Supreme Court. In a brief per curiam order the Court said that if the college notified the Department of Health and Human Services in writing of its religious objection to providing coverage for certain types of contraceptives, the Department could rely on the notice "to facilitate the provision of full contraceptive coverage under the Act"—in other words, to notify the insurers that they would be obligated to provide, to the members of the Wheaton College community, "without cost, the full range of FDA approved contraceptives." *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). The Department notifies the insurers of their obligation to provide contraceptive coverage in the college's stead without cost to, or any involvement of, the college.

The college argues that it remains involuntarily complicit in the provision of emergency contraception because its notification to the Department that it objects to the provision of contraception on religious grounds serves as the "trigger" of the Department's ordering the insurers to cover emergency contraception. It says as the trigger-puller or facilitator the college shares responsibility for the extension of such cover-

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 9 of 18 PageID #:26663
Case: 14-2396 Document: 00711592614 Filed: 07/01/2015 Pages: 18

No. 14-2396 9

age to its students, faculty, and staff. That also is incorrect. The Affordable Care Act requires insurers to provide coverage for FDA-approved emergency as well as traditional contraception to Wheaton's students and employees, and to pick up the tab for that coverage (which the government reimburses) should Wheaton decide to opt out of paying for emergency-contraception coverage on religious grounds. As we explained in *University of Notre Dame v. Burwell*, 786 F.3d 606, 614–15 (7th Cir. 2015), it is the *law*, not any action on the part of the college, that obligates insurers "to pick up the ball if [the college] decides, as is its right, to drop it. [The college's notification to the government] no more 'triggers' [the insurer's] obligation to provide contraceptive services than a tortfeasor's declaring bankruptcy 'triggers' his co-tortfeasors' joint and several liability for damages. [The insurer] must provide the services no matter what; [by notifying the government, the college] simply shifts the financial burden from the university to the government, as desired by the university." Wheaton College does not want to be involved in the provision of emergency contraceptives; pursuant to its wishes, it no longer *is* involved.

It doesn't claim any right to prevent its students or employees (not to mention dependents of those employees, who are also covered by Wheaton's health plans) from obtaining access to emergency contraceptives covered by the Affordable Care Act. But it seeks to make that access difficult. For supposing that the college has no obligation to notify the government or the insurers that it doesn't want to cover emergency contraception, how are the government and the insurers to find this out? Are they required to investigate every college? All that the government requires of an opt out like Wheaton—and it isn't much—is that

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 10 of 18 PageID #:26664
Case: 14-2396 Document: 00711592614 Filed: 07/01/2015 Pages: 18

10 No. 14-2396

> When a notice is provided to the Secretary of Health and Human Services, the notice must include the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (i.e., whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers. If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services. The Department of Labor (working with the Department of Health and Human Services), shall send a separate notification to each of the plan's third party administrators informing the third party administrator that the Secretary of Health and Human Services has received a notice under paragraph (b)(1)(ii) of this section and describing the obligations of the third party administrator under § 2510.3–16 of this chapter and this section.

29 C.F.R. § 2590.715-2713A(b)(ii)(B). This is hardly a burdensome requirement; nor does it leave the provider—the opt out—with any residual involvement in the coverage of drugs or devices of which it sincerely disapproves on religious grounds.

At oral argument Wheaton College's lawyer told us that the college does not object to having to inform the Department of Health and Human Services that it is a religious in-

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 11 of 18 PageID #:26665
Case: 14-2396 Document: 00712592614 Filed: 07/01/2015 Pages: 18

No. 14-2396 11

stitution unwilling to provide emergency-contraception coverage, but that it does object to identifying its health insurers to the government. It claims the right to tell the government no more than that "we're Wheaton College and we object to coverage of emergency contraception for our students or our employees and by the way we won't give you the names of our students or employees or insurers to make it easier for you to arrange alternative coverage for such contraception." The government could, though at some expense, discover who they were without being told by Wheaton. Would that satisfy Wheaton? It hasn't told us, but we suspect not, because in Wheaton's view its notice to the government would still "trigger" the provision of emergency-contraception to its students and employees by its insurers, albeit not pursuant to its contracts with them. Wheaton's antipathy is to having *any* contractual relations with insurers who provide emergency contraception to members of the Wheaton College community. Because they are "its" insurers, someone not in the know might think it "complicit" in the insurers' provision of a type of coverage that offends Wheaton's religious views. But where's the complicity?

Even with a strong case Wheaton could not obtain an injunction against the insurers when it hasn't named them as defendants in its complaint. They now have a contract with the government obliging them to insure the members of the Wheaton community for emergency contraception. The contract provides them with generous reimbursement. See *University of Notre Dame v. Burwell*, *supra*, 786 F.3d at 613. We don't know what the contracts' duration is or whether or in what circumstances they are terminable by Wheaton College before their expiration date. All that is clear is that the insurers have an interest in this case yet have not been made par-

ties. In any event, termination of the contracts would give Wheaton only temporary relief, since the government would notify any new insurers hired by Wheaton of their legal obligation to provide emergency-contraceptive coverage.

At oral argument Wheaton's lawyer said that his client has no objection to the government's using the college's insurers to provide emergency-contraceptive coverage as long as it's not "using" Wheaton's contract with the insurers or requiring them to provide contraceptives to Wheaton's students *because* Wheaton has chosen to opt out. The two conditions are inconsistent; it's *because* Wheaton has opted out that the government is ordering the insurers to provide coverage in lieu of Wheaton rather than to continue insuring Wheaton. The first condition, standing alone, would imply that if the government had a contract with an insurer to provide emergency-contraception coverage to all college students, or to all college students who sought coverage because they were not getting it through their university plans, Wheaton would be content. (We wonder.)

We can't order the U.S. government not to ask particular insurers to insure Wheaton's students and employees—especially the insurers that are experienced in dealing with the members of the Wheaton community. As for Wheaton's apparent preference that the government discover through its own research the names of Wheaton's insurers, we cannot imagine that insistence on this roundabout path to imparting essential information to the government could justify a preliminary injunction, at least in the absence of any explanation by Wheaton of *why* it thinks the difference between direct and roundabout identification of its insurers pertinent to its religious commitments.

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 13 of 18 PageID #:26667
Case: 14-2396   Document: 00711592614   Filed: 07/01/2015   Pages: 18

No. 14-2396 13

Wheaton's complaint, which it has never tried to amend, was filed back in 2013 and sought relief only against having to opt out of emergency-contraception coverage by notifying the insurers. That was the only method of opting out authorized by federal law at the time. The alternative of being allowed to notify the government instead of the insurers came later. The college objects emphatically to that alternative as well, yet hasn't indicated how it thinks the government would have learned of its objections had it not sued. It does argue that the government has alternatives to making the college's insurers cover emergency contraception, such as telling the students and employees to find their own insurance through government-run health exchanges or arranging coverage itself (maybe by creating an Emergency-Contraception Bureau in the Department of Health and Human Services). But as we discussed in the *Notre Dame* case, these alternatives would "involve cumbersome administrative machinery and at the same time impose a burden on [the college's] female students and employees who want to obtain contraceptives." 786 F.3d at 617. And we don't understand how a government program to provide contraception directly to Wheaton's students and employees would relieve the college of its "complicity" in the provision of the forbidden contraceptives: "Were [the college] to hire an unemployed person who, by virtue of becoming employed by [the college], obtained contraception coverage for the first time, would not the university be 'triggering' the new employee's access to contraception?" *Id.*

Wheaton relies on its Community Covenant, which we quoted from and which all students and employees are required to sign, for the proposition that its students and employees share Wheaton's belief about emergency contracep-

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 14 of 18 PageID #:26668
Case: 14-2396 Document: 00711592614 Filed: 07/01/2015 Pages: 18

14 No. 14-2396

tives and so the government has no interest in ensuring their access to emergency-contraceptive coverage. Remember, however, that the covenant does not mention emergency contraception, or for that matter "traditional" contraception (which Wheaton does not disapprove); it states merely that the covenant's signers must "uphold the God-given worth of human beings, from conception to death." Wheaton as we know interprets this to prohibit the use of emergency contraceptives, but do all its students and employees interpret this broad statement in the same way? Must they? And what about the dependents of members of the college community? They don't have to sign the Community Covenant and may not share Wheaton's religious beliefs. We haven't been told what happens to their coverage of emergency contraception if the college prevails in its suit.

If the college is correct that the government has no real stake in the provision of such coverage to members of the Wheaton College community because they're all signers of the covenant, this actually undermines its case, by suggesting that its insurers are never asked to provide such coverage to members of the college community, making the college's complaints academic. Queried at oral argument whether any member of the community has ever been known to violate any of the conditions in the Community Covenant, or been expelled or otherwise punished for such a violation, Wheaton's lawyer said he was unaware of any. (The college's student handbook, 59 pages of fine print, which is not in the appellate record but is available online at www.wheaton.edu/~/media/Files/Student-Life/StudentHandbook-2014-15.pdf, makes clear that students are required to adhere to the Community Covenant and describes a wide range of sanctions, but the covenant does not mention con-

Case: 1:13-cv-08910 Document #: 93 Filed: 08/24/15 Page 15 of 18 PageID #:26669
Case: 14-2396 Document: 00712592614 Filed: 07/01/2015 Pages: 18

No. 14-2396 15

traceptives or contraception coverage.) If the implicit prohibition of emergency contraception is totally effective—and Wheaton College has presented no evidence, or even alleged, that it is not—the terms of its contracts with its insurers are indeed academic. It's as if the Affordable Care Act had entitled sterile women to emergency contraceptives.

The college refers in its brief to a hypothetical "dissatisfied Wheaton employee who wants" insurance coverage for emergency contraceptives. It doesn't say there are any such employees, however, and implies there are not; for it says that "Wheaton's employees and students choose to work at or attend Wheaton because they share its religious beliefs and wish to help Wheaton further its mission. Wheaton would violate their implicit trust in the organization and detrimentally alter its relationship with them if it were to violate its religious beliefs regarding abortion." No one is asking Wheaton to violate its religious beliefs. Besides, if such a "violation" would distress its staff and students, this implies that they indeed adhere to the Community Covenant, and if so Wheaton College need have no fear that any of them will ever use the forbidden contraceptives. So far as we know it has no such fear—its "dissatisfied" employee is a chimera.

The college tells us as we said that it has no objection even to universal coverage by the government of emergency contraception. Yet as that would give the college's students and employees access to the forbidden contraceptives free of charge, the impact on Wheaton would be unaltered from what it is now.

The college advances secondary grounds for the relief that it seeks. One is that the government is discriminating against the college because churches have been exempted

from the contraception provisions in the Affordable Care Act and therefore do not have to notify anyone of their unwillingness to provide their employees or parishioners with coverage for contraception. Part of the relief it seeks is "requiring [the government] to treat Wheaton as an exempt 'religious employer.'" But Wheaton College does not claim to be a church, or explain how without some notification to the government, or to its insurers, an organization that is not, like a church, automatically exempt becomes known to the government as having religious views that clash with, and entitle it to opt out of, the federal law. At oral argument we asked the college's lawyer whether the college could incorporate itself as a religious organization; he said he didn't know.

Wheaton further argues that requiring it to ask for an exemption and to provide the government with the name of its insurer violates its First Amendment rights by compelling it to say something that it does not want to say. That would be the equivalent of entitling a tax protester to refuse on First Amendment grounds to fill out a 1099 form and mail it to the Internal Revenue Service. Wheaton remains free to voice its opposition to the use of emergency contraceptives. "Requiring Plaintiffs to give notice that they wish to opt out of the contraceptive coverage requirement no more compels their speech in violation of the First Amendment than does demanding that a conscientious objector self-identify as such." *Priests for Life v. U.S. Dept. of Health & Human Services*, 772 F.3d 229, 271 (D.C. Cir. 2014).

The college argues that the government is violating ERISA by designating a third-party administrator of Wheaton College's health plans to be the plan administrator

No. 14-2396 17

for coverage of emergency contraception. As we know, when notified that a provider of health insurance has religious objections to providing (through insurance companies or directly) coverage for some government-approved medical procedure, the government directs the insurer(s) to provide the coverage itself. This direction constitutes what is termed a "plan instrument," and section 402(a) of ERISA, 29 U.S.C. § 1102(a), requires that every employee benefit plan be established and maintained pursuant to a written instrument that must designate one or more named fiduciaries to administer the plan. The plan instrument designates the plan administrator; the governmental plan instrument in this case—the government's direction to the insurer—designates the insurer as the plan administrator. 29 U.S.C. § 1002(16)(A)(i). What had been Wheaton's plan, so far as emergency contraception was concerned, the Affordable Care Act made the government's plan when Wheaton refused to comply with the Act's provision on contraception coverage.

Last the college argues that the government conduct that it asks us to enjoin "violates the Administrative Procedure Act because it is arbitrary, capricious, and contrary to law." But this just relabels the grounds for relief that we've discussed; there is no additional argumentation.

Quite apart from the merits of its arguments, or lack thereof, Wheaton College has failed to satisfy two basic requirements for the issuance of a preliminary injunction. It has failed to show that delaying a judgment in its favor to the conclusion of proceedings in the district court would do the college any harm. In the absence of any evidence or even allegation that any member of the college community is vio-

18                                                                                      No. 14-2396

lating or is expected to violate or believed likely to violate the college's prohibition of emergency contraception, there is no reason to think that even if the college's merely notifying the government of its objection to emergency contraception could "trigger" emergency-contraception coverage it would do so while this case was pending. The college has also failed to match the relief it seeks to the illegalities it alleges. Almost the entire weight of its case falls on attempting to show that the government is trying to "use" the college's health plans, and it is this alleged use that it primarily asks us to enjoin. But the government isn't using the college's health plans, as we have explained at perhaps excessive length. And the relief sought has no connection to Wheaton's complaints about allegedly forced speech and the alleged violation of ERISA and the APA; nor has Wheaton offered support for its claim to be treated as if it were a church.

    The denial of a preliminary injunction is therefore

                                                                                                                                                                       AFFIRMED.